COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Fitzpatrick, Judges Benton, Elder, Annunziata, Bumgardner, Frank,
            Humphreys, Clements, Felton, Kelsey and McClanahan
Argued at Richmond, Virginia


SHARON C. BOYD

v.              Record No. 0377-02-2

COUNTY OF HENRICO

DIANNA LEE WHITE
                                                        OPINION BY
v.              Record No. 0380-02-2            JUDGE D. ARTHUR KELSEY
                                                      FEBRUARY 24, 2004
COUNTY OF HENRICO

DONNA JEAN WHITE

v.              Record No. 0381-02-2

COUNTY OF HENRICO


UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF HENRICO COUNTY
George F. Tidey, Judge

C. David Whaley (Anthony G. Spencer; Morchower, Luxton & Whaley,
on brief), for appellants.

Michael V. Gerrard, Deputy Commonwealth's Attorney, for appellee.

*Amicus Curiae*:  Local Government Attorneys of Virginia, Inc.
(Andrew McRoberts, Goochland County Attorney; Walter C. Erwin,
Lynchburg City Attorney, on brief), for appellee.


The trial court convicted Sharon Boyd, an erotic dancer, of violating Henrico County's

public nudity ordinance.  The two owners of the strip club, Dianna Lee White and Donna Jean

White, were convicted of aiding and abetting Boyd's violation.  They now appeal, claiming their

misdemeanor convictions should be overturned on various theories. A divided panel of our

Court vacated all three convictions. <u>Boyd v. County of Henrico</u>, 41 Va. App. 1, 581 S.E.2d 863

(2003). Having reconsidered the matter *en banc*, we reject appellants' challenge to the public

nudity ordinance and affirm their convictions.

I.

Henrico enacted its public nudity ordinance in 1982. Its text tracks the language of

similar public nudity ordinances adopted across the Commonwealth.[1] The Henrico County

Board of Supervisors explained its legislative intent in enacting the ordinance this way:

> The purpose of this ordinance is to make unlawful displays of
> public nudity in the County, which are deemed offensive to public
> morality and injurious to the health, safety and general welfare of
> County citizens, regardless of whether such nudity would or would
> not in any specific instance be deemed obscene. The ordinance
> contains exceptions for exhibitions and other performances in
> institutions or establishments, such as theaters and concert halls,
> primarily devoted to expressions of opinion, communication,
> speech, ideas, information, art or drama. The ordinance is based

---

[1] Virtually identical ordinances include Accomack County Code § 58-2; City of Alexandria Code § 13-1-17; Town of Ashland Code § 12-8.9; Blacksburg City Code § 14-108; Chesterfield County Code § 14-33; City of Fairfax Code § 54-227; City of Falls Church Code § 22-40; City of Franklin Code § 19-33; County of Franklin Code § 13-13; Town of Leesburg Code § 11-91; City of Manassas Code § 78-261; Montgomery County Code § 7-38; City of Newport News Code § 27-10.2; City of Norfolk Code § 28-12; City of Radford Code § 60-2; City of Roanoke Code § 21-125; City of Richmond Code § 20-104; County of Southampton Code § 10-40; City of Suffolk Code § 54-34; City of Virginia Beach Code § 22-10; York County Code § 15.5-10.1. Ordinances recognizing similar offenses include City of Emporia Code § 90-53; City of Fredericksburg Code § 13-16.1; City of Hopewell Code § 24-10 (indecent exposure); Town of Mount Jackson Code § 38-30 (indecent exposure); New Kent County Code § 46-15 (indecent exposure); City of Norton Code § 14-219 (indecent exposure); City of Petersburg Code § 74-315 (indecent exposure); Town of Purcellville Code § 46-79 (indecent exposure); City of Salem Code § 58-17 (indecent exposure); City of Smithfield Code § 50-14 (indecent exposure); Town of South Boston Code § 70-123 (indecent exposure); Spotsylvania County Code § 14-17 ("Indecent Exposure By Entertainers, Waitresses, Waiters, etc."); Stafford County Code § 17-9 (indecent exposure); Town of Warrenton Code § 11-16 (indecent exposure); City of Winchester Code § 15-9 (indecent exposure); City of Wytheville Code § 9-14 (indecent exposure).

on similar legislation enacted in York County and the City of Virginia Beach,[2] to mention two examples.

Since 1982, thirty-eight individuals had been prosecuted under the public nudity ban. This one case involves the only application of the ordinance against erotic dancers.

On July 6, 2001, officers from the Henrico County Police Department went to a newly opened erotic club named Gold City Showgirls. While there, the officers observed ten female dancers strip down to "pasties" and "G-strings" in exchange for tips. The officers issued summonses to the ten dancers they observed, including Boyd, for violating the public nudity ordinance and to a club manager, Donna White, for aiding and abetting the violations.[3] On July 8, 2001, the officers returned and observed the same type of semi-nude dancing. The officers issued a summons to Dianna White, the manager on duty, and a second summons to Boyd.

After being found guilty in general district court, appellants appealed to circuit court. In the meantime, the owners of Gold City and two erotic dancers filed a civil action in United States District Court for the Eastern District of Virginia asserting that the ordinance should be declared unconstitutional and the state prosecution enjoined. The federal district court abstained from ruling on this issue. Colonial First Props., LLC v. Henrico County Virginia, 166 F. Supp. 2d 1070 (E.D. Va. 2001). The state circuit court case went to trial in late 2001. The parties to the criminal case agreed that depositions taken in the federal case could be submitted *de bene esse* to

---

[2] The Virginia Supreme Court rejected a challenge to the Virginia Beach public nudity ordinance in Wayside Rest., Inc. v. Virginia Beach, 215 Va. 231, 208 S.E.2d 51 (1974).

[3] At the time of the offenses in this case, Henrico County Code § 13-107 made it a misdemeanor to

> expose the human male or female genitals, pubic area or buttocks or to cover any of them with less than a fully opaque covering, or the showing of the female breast or any portion thereof below the top of the nipple, or covering of the breast or any portion thereof below the top of the nipple with less than a fully opaque covering.

Henrico County Code § 13-107(a).

the state court.  The parties, however, did not agree to submit to the state trial court the transcript

of the federal court proceeding.  Nor did they stipulate to any factual findings made by the

federal district court during the abstention hearing.[4]

The trial court rejected appellants' constitutional challenges and heard the cases on the

merits.  At trial, appellants admitted the dancers wore "pasties" and "G-strings" on July 6 and

July 8, 2001.  The dancers conceded that their state of undress violated the public nudity

ordinance, but instead claimed that their striptease act fell within the exemption in the ordinance

for the performance of "any play, ballet, drama, tableau, production or motion picture" in a

theater, concert hall, or the like.  Henrico County Code § 13-107(c).[5]  After hearing testimony

from eight dancers and the two owners of Gold City, the trial court found as a fact that Gold City

was not a "theater" under the ordinance and the dancers were not engaged in any "theatrical

performance either."

---

[4] In their appellate brief, appellants quote statements of the County's counsel made
during the federal district court hearing.  See J.A. 131-35, 141-71.  None of these statements,
however, appears in the trial record of the case before us.  Under basic principles of appellate
review, we may not go beyond the record developed in the trial court.  See John v. Im, 263 Va.
315, 320, 559 S.E.2d 694, 697 (2002) (On appeal, "we are limited to an examination of the
record before us" and cannot consider evidence that the appellant "failed to submit to the trial
court.").  The transcript of the federal district court proceeding, therefore, should not have been
included in the joint appendix.  See Albert v. Albert, 38 Va. App. 284, 291 n.2, 563 S.E.2d 389,
392 n.2 (2002) ("While the appendix contains worksheets, they were not offered into evidence at
the hearing nor were they made part of the proffer.  These documents, therefore, are not part of
the record and will not be considered by this Court.").

[5] The full text of the exemption provides:
> Nothing contained in this section shall be construed to apply to the
> exhibition, presentation, showing or performance of any play,
> ballet, drama, tableau, production or motion picture in any theater,
> concert hall, museum of fine arts, school, institution of higher
> learning or other similar establishment which is primarily devoted
> to such exhibitions, presentations, shows or performances as a
> form of expression of opinion, communication, speech, ideas,
> information, art or drama.

Henrico County Code § 13-107(c).

II.

Appellants challenge the public nudity ordinance on various grounds. They contend that (a) the public nudity ordinance infringes on their First Amendment right to erotic dancing; (b) the ordinance should be declared void for vagueness; (c) the County violated equal protection principles by selectively enforcing the ordinance against them; (d) the County has no delegable authority from the General Assembly to enact this ordinance; and (e) the evidence proves their entitlement to the theater exemption to the ordinance.[6]

We begin our analysis with basic principles of judicial review. All legislative acts are "presumed to be constitutional." In re Phillips, 265 Va. 81, 85, 574 S.E.2d 270, 272 (2003); see also Bosang v. Iron Belt Bldg. & Loan Ass'n, 96 Va. 119, 123, 30 S.E. 440, 441 (1898); Johnson v. Commonwealth, 40 Va. App. 605, 612, 580 S.E.2d 486, 490 (2003) (recognizing that every legislative act "is presumed to be constitutional, and the Constitution is to be given a liberal construction so as to sustain the enactment in question, if practicable"). This presumption is "one of the strongest known to the law." Harrison v. Day, 200 Va. 764, 770, 107 S.E.2d 594, 598 (1959). Under it, courts must "resolve any reasonable doubt" regarding the constitutionality

---

[6] Sprinkled throughout appellants' brief are isolated sentences, sometimes mere phrases or words, that implicate other legal issues. In a single sentence, for example, appellants claim the ordinance "operates as a regulatory taking without just compensation" in violation of due process principles. Appellants also mention, in an argument heading, the right of "free association" without any further elaboration. The word "over-breadth" is used once, apparently (and erroneously) as a synonym for the word "vagueness." Similar perfunctory statements are made about the lack of "prompt judicial review" and the County's failure to leave "sufficient sites for adult businesses to open and operate." The trial record reflects that few, if any, of these conclusory assertions were adequately raised below. In any event, we will not consider them on appeal. Rule 5A:20(e) requires the appellants' brief to include, among other things, the "principles of law, the argument, and the authorities relating to each question presented." Statements unsupported by "argument, authority, or citations to the record" do not merit appellate consideration. Thomas v. Commonwealth, 38 Va. App. 319, 321 n.1, 563 S.E.2d 406, 407 n.1 (2002); Dickerson v. Commonwealth, 36 Va. App. 8, 15, 548 S.E.2d 230, 234 (2001); Bennett v. Commonwealth, 35 Va. App. 442, 452, 546 S.E.2d 209, 213 (2001); Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992).

of a law in favor of its validity. In re Phillips, 265 Va. at 85, 574 S.E.2d at 272; see also

Wayside Rest., Inc. v. Virginia Beach, 215 Va. 231, 236, 208 S.E.2d 51, 55 (1974) (holding

public nudity ordinance constitutional). "To doubt is to affirm." Peery v. Bd. of Funeral Dirs.,

203 Va. 161, 165, 123 S.E.2d 94, 97 (1961) (quoting City of Roanoke v. Elliott, 123 Va. 393,

406, 96 S.E. 819, 824 (1918)).

### A. *The Public Nudity Ordinance Does Not Violate The First Amendment.*

Statutes prohibiting public nudity are of "ancient origin" and "reflect moral disapproval of

people appearing in the nude among strangers in public places." Barnes v. Glen Theatre, Inc., 501

U.S. 560, 568 (1991) (plurality). For this reason, it has been the traditional view that whatever

natural law construct exists to support the "right to appear *au naturel* at home," that right is

"relinquished when one sets foot" outside. Richards v. Thurston, 424 F.2d 1281, 1285 (1st Cir.

1970).[7] Even so, in the "outer ambit" of constitutional theory, the erotic speech component of a

particular form of public nakedness — nude dancing at strip clubs — receives "some measure" of

First Amendment protection. Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) (plurality); see also

Barnes, 501 U.S. at 566. The right, however, is hardly a robust one. At best, it receives a

"diminished form of protection under the First Amendment," Ben's Bar, Inc. v. Village of

Somerset, 316 F.3d 702, 707 (7th Cir. 2003), because it involves the "barest minimum of protected

---

[7] See also United States v. Biocic, 928 F.2d 112, 116 (4th Cir. 1991) (finding no right to public nudity under "the profound rights of personhood and privacy"); Chapin v. Southampton, 457 F. Supp. 1170, 1174 (E.D.N.Y. 1978) ("It is undoubted that public nudity can be banned." (citation omitted)); Tri-State Metro Naturists v. Lower, 529 A.2d 1047, 1050-53 (N.J. Super. Ct. Law Div. 1987) (recognizing that no right to appear nude in public exists under the First, Fifth, or Fourteenth Amendments); People v. Hollman, 500 N.E.2d 297, 301 (N.Y. 1986) (observing that "prohibiting public nudity is plainly within the State's police powers"); State v. Ciancanelli, 45 P.3d 451, 455 (Or. 2002) (surveying historical disdain toward public nudity); Lacour v. State, 21 S.W.3d 794, 796 (Tex. App. 2000) (recognizing public nudity as "merely conduct; not expressive conduct").

expression," Barnes, 501 U.S. at 565 (quoting Doran v. Salem Inn, Inc., 422 U.S. 922, 932 (1975)). Put another way, the right is only "marginally" within the "outer perimeters" of the First Amendment. Barnes, 501 U.S. at 566.

Appellants claim the Henrico public nudity ordinance violates the marginal free speech rights inherent in erotic dancing. They rest this claim on two assertions. First, appellants contend the ordinance constitutes the most serious of all First Amendment violations: a content-based restriction on free speech.[8] Second, appellants argue that the public nudity ordinance — even if not content based — still works such a hardship on their free speech rights that it must be declared unconstitutional. We reject both arguments, finding they reflect a basic misunderstanding of First Amendment law.

A law regulating expressive activity should be deemed content neutral "so long as it is '*justified* without reference to the content of the regulated speech.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (emphasis in original and citation omitted). Because such regulations are "unrelated to [the suppression of] expression," Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 567 (2001), they are subjected to a "less-rigorous analysis," Turner Broad. Sys. v. FCC, 520 U.S. 180, 213 (1997). Sufficient government interests justifying content-neutral regulations include "preventing harmful secondary effects," Erie, 529 U.S. at 293, and "protecting order and morality," Barnes, 501 U.S. at 569, both classic expressions of state police powers.

---

[8] Laws that "by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." Bartnicki v. Vopper, 532 U.S. 514, 526 (2001) (quoting Turner Broad. System, Inc. v. FCC, 512 U.S. 622, 642-43 (1994)). Content-based regulations on speech can withstand a constitutional challenge only by satisfying "the most exacting scrutiny." Turner Broad. System, Inc., 512 U.S. at 641-42; see also Republican Party of Minnesota v. White, 536 U.S. 765, 774-75 (2002); Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 434 (2002) (plurality).

The Henrico public nudity ban regulates conduct — not the content of anyone's speech. In this respect, the ordinance is no different from either of the two public nudity laws deemed content neutral in Barnes and Erie. As the United States Supreme Court said in Erie:

> The ordinance here, like the statute in Barnes, is on its face a general prohibition on public nudity. By its terms, the ordinance regulates conduct alone. It does not target nudity that contains an erotic message; rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity.

Erie, 529 U.S. at 290. The same can be said of the Henrico ordinance.

True, some may "view restricting nudity on moral grounds as necessarily related to expression." Barnes, 501 U.S. at 570. And, in an abstract sense, it is entirely fair to say that people "who go about in the nude in public may be expressing something about themselves by so doing." Id. This point, however, proves too much. Taken to its logical limits, it obliterates any First Amendment distinctions between speech and conduct. A flasher in a public mall may genuinely intend to communicate a message — whether erotic, neurotic, or both. But the communicative element in his conduct should receive no constitutional protection. Despite the libertarian traditions animating the First Amendment, we are not dealing here with protecting the societal value of "untrammeled political debate" and "few of us would march our sons and daughters off to war to preserve a citizen's right" to unlimited expression of public sexuality. Erie, 529 U.S. at 294 (quoting Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 70 (1976)).

Appellants take no issue with Erie or Barnes, but instead seek to distinguish them on the ground that the Henrico ordinance contains an exemption for theatrical performances. The public nudity ban in Erie, appellants argue, applied to theaters. From there, appellants reason that the theatrical nudity exemption in the Henrico ordinance transforms an otherwise permissible, content-neutral public nudity ban into a thinly disguised content-based restriction. We disagree.

Despite the fact that the public nudity ban in Erie did not include an express exemption, the prosecutor in Erie stipulated that the ban did not apply to theatrical and artistic nudity. Making the same argument as appellants do here, the dissent in Erie seized upon this stipulation:

> In an earlier proceeding in this case, the Court of Common Pleas asked Erie's counsel "what effect would this ordinance have on theater . . . productions such as Equus, Hair, O[h!] Calcutta[!]? Under your ordinance would these things be prevented . . . ?" Counsel responded: "No, they wouldn't, Your Honor." App. 53. Indeed, as stipulated in the record, the city permitted a production of Equus to proceed without prosecution, even after the ordinance was in effect, and despite its awareness of the nudity involved in the production. . . . As presented to us, the ordinance is deliberately targeted at Kandyland's type of nude dancing (to the exclusion of plays like Equus), in terms of both its applicable scope and the city's enforcement.
>
> \* \* \* \* \* \* \*
>
> Nor could it be contended that selective applicability by stipulated enforcement should be treated differently from selective applicability by statutory text. See Barnes, 501 U.S. at 574 (Scalia, J., concurring in judgment) (selective enforcement may affect a law's generality). Were it otherwise, constitutional prohibitions could be circumvented with impunity.

Id. at 328 n.12 (Stevens, J., dissenting). The plurality in Erie rejected this argument and acknowledged that its own analysis presupposed that the public nudity ban had "the effect of limiting one particular means of expressing the kind of erotic message being disseminated at Kandyland." Id. at 293.

The same is true of the public nudity ban in Barnes. Notwithstanding the absence of any express exemption, the public nudity ban there had been construed by the state courts to exclude theatrical nudity.[9] The Supreme Court acknowledged this limiting construction on the ordinance

---

[9] See Indiana v. Baysinger, 397 N.E.2d 580, 587 (Ind. 1979) (noting that it is "constitutionally required to tolerate or to allow some nudity as a part of some larger form of expression meriting protection" and, therefore, limiting the reach of the Indiana Public Indecency statute only to activities involving pure conduct containing no constitutionally protected expressive element); Glen Theatre, Inc. v. Pearson, 802 F.2d 287, 289 (7th Cir. 1986) (basing its

as a legitimate effort by the state courts to "save it from a facial overbreadth attack." Barnes,

501 U.S. at 564 n.1.  In his concurring opinion, Justice Scalia agreed:

> Respondents also contend that the statute, as interpreted, is not
> content-neutral in the expressive conduct to which it applies, since
> it allegedly does not apply to nudity in theatrical productions.  See
> State v. Baysinger, 272 Ind. 236, 247, 397 N.E.2d 580, 587 (1979).
> I am not sure that theater versus non-theater represents a
> distinction based on content, rather than format, but assuming that
> it does, the argument nonetheless fails for the reason the plurality
> describes, *ante*, at 564, n.1.

Id. at 574 n.2.

By including an express exemption for theatrical nudity, Henrico merely put in writing

what was implicit in both the Erie and Barnes public nudity bans.  The exemption in the Henrico

ordinance does nothing more than ensure that the ordinance incidentally restricts the least

amount of expressive conduct, and thus, protects the ordinance against an overbreadth challenge.

See, e.g., Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 517-19 (4th Cir. 2002) (holding lack

of a theater exemption raised overbreadth problems sufficient to warrant a preliminary

injunction).

In addition, the theatrical nudity exemption reflects a legitimate recognition of the unique

secondary effects associated with erotic clubs.  "Establishments that purvey erotica, live or

pictorial, tend to be tawdry, to be offensive to many people, and to attract a dubious, sometimes a

disorderly, clientele." Blue Canary Corp. v. City of Milwaukee, 251 F.3d 1121, 1124 (7th Cir.

2001).  The impact of erotic dancing and other sexually oriented businesses on the surrounding

community is "all too real." Alameda Books, Inc., 535 U.S. at 444 (Kennedy, J., concurring).[10]

---

rejection of the plaintiff's overbreadth claim on the limiting construction provided by
Baysinger).

[10] See Erie, 529 U.S. at 299 (rejecting suggestion in dissenting opinion that municipality
must develop "specific evidentiary record" on secondary effects); Giovani Carandola, Ltd., 303
F.3d at 514 ("No record evidence supports this [secondary effects] claim . . . .  Even though the

A public nudity ban should be "properly evaluated as a content-neutral restriction because the interest in combating the secondary effects associated with those clubs is unrelated to the suppression of the erotic message conveyed by nude dancing." Erie, 529 U.S. at 296; see also Clark v. City of Lakewood, 259 F.3d 996, 1004 (9th Cir. 2001). So, while the messages conveyed by erotic dancing and theatrical nudity may be similar, the social by-products of each medium may be considerably different. See DLS, Inc. v. Chattanooga, 107 F.3d 403, 412 n.9 (6th Cir. 1997).[11] Within the "limited field of regulations on public exhibitions of adult entertainment," therefore, the presence of negative secondary effects permits public nudity regulations to be treated "as content-neutral and so subject only to intermediate scrutiny." Giovani Carandola, Ltd., 303 F.3d at 515.

All of this leads to the application of the four-part test governing content-neutral restrictions on speech. Under that test, the Henrico ordinance survives scrutiny if it (i) falls within "the constitutional power" of the county, (ii) furthers an "important or substantial government interest," (iii) furthers that interest in a manner "unrelated to the suppression of free expression," and (iv) imposes no greater incidental restriction on protected speech "than is essential to the furtherance of that interest." Erie, 529 U.S. at 296-301; see also Barnes, 501 U.S. at 567 (quoting United States v. O'Brien, 391 U.S. 367, 376-77 (1968)). Appellants concede the Henrico public nudity ban satisfies prong one. They make no mention of prong two, except to

_____

Commission has submitted no direct evidence of legislative motive, we believe that precedent requires us to evaluate the challenged restrictions as content-neutral provisions aimed at secondary effects.").

[11] A municipality's means for attacking secondary effects need not "greatly reduce these secondary effects." SOB, Inc. v. County of Benton, 317 F.3d 856, 863 (8th Cir. 2003) (citing Erie, 529 U.S. at 301). Instead, the means must merely "further the interest in combating such effects." Id. (citing Erie, 529 U.S. at 301). Municipalities enjoy this leeway to have "a reasonable opportunity to experiment with solutions to admittedly serious problems." SOB, Inc., 317 F.3d at 863 (citation omitted).

mischaracterize it as requiring a "compelling" state interest, a requirement reserved only for content-based restrictions. Appellants focus their challenge on prongs three and four.

On the third prong, appellants argue that the purpose of the ordinance is unrelated to the suppression of free expression, but its application is not. In support, appellants again assert that the theatrical exemption (written into the text of the ordinance) requires law enforcement officials to make content-based distinctions. As noted earlier, however, the same exemption was present in Barnes and Erie. It serves an important limiting function and thereby avoids potential overbreadth problems with the ordinance. See Barnes, 501 U.S. at 564 n.1. The exemption also rests on a valid assessment of the differing secondary effects between the two venues. The focus on secondary effects was at the heart of the Erie holding:

> Even if we had not already rejected the view that a ban on public nudity is necessarily related to the suppression of the erotic message of nude dancing, we would do so now because the premise of such a view is flawed. The State's interest in preventing harmful secondary effects is not related to the suppression of expression.

Erie, 529 U.S. at 292. The theatrical exemption, therefore, does not violate the third prong of the content-neutral test any more than it did in Barnes or Erie.

Appellants also contend that the Henrico ordinance violates the fourth prong. On this issue, appellants claim that the legislative intent of the ordinance was merely "to prevent urinating in public and similar problems." But, because the literal text of the ordinance also applies to erotic dancing, appellants reason, the ordinance goes further than necessary "to prevent or deter public urination, 'mooning' or skinny dipping."

We cannot accept this analysis for several reasons. To begin with, the trial court made no factual finding that the purpose of the ordinance was limited to public urination, mooning, and skinny dipping. Appellants' assertion appears to be taken from a memo from a lieutenant in the county police department to the police chief. The memo mentions the need for an ordinance to

outlaw public urination, mooning, and skinny dipping. The same memo, however, also adds that the ordinance should prohibit "generally being nude in public." Appellants' assertion, therefore, relies on a non-legislative source that, in any event, contemplates a greater scope than merely proscribing mooning, public urination, and skinny dipping.

The only reliable source for legislative intent in this record can be found in a memo of the Henrico County Board of Supervisors accompanying the proposed ordinance at the time of its enactment. It makes clear that the stated purpose of the public nudity ban involves broad concerns over "public morality" and the need to regulate conduct that the legislative body deemed "injurious to the health, safety and general welfare" of the community. It was exactly these concerns over "secondary effects, such as the impacts on public health, safety, and welfare," Erie explained, "which we have previously recognized are 'caused by the presence of even one such' establishment." Erie, 529 U.S. at 291 (citation omitted). Barnes likewise found that an identical expression of the "traditional police power" of a state to "provide for the public health, safety, and morals" may serve as a permissible legislative goal for the enactment of a public nudity ordinance applicable to erotic dancing. Barnes, 501 U.S. at 569.[12]

Properly applied, the fourth prong of the Erie content-neutral test requires us to consider whether the ordinance imposes too great an incidental burden on speech. Before engaging in this analysis, we must first frame the issue precisely. The only constitutional right here (albeit one

---

[12] Even if we did not have this legislative history, the legislative intent underlying public nudity bans can be inferred as a matter of law. See Barnes, 501 U.S. at 567-68 ("It is impossible to discern, other than from the text of the statute, exactly what governmental interest the Indiana legislators had in mind when they enacted this statute . . . . Nonetheless, the statute's purpose of protecting societal order and morality is clear from its text and history. Public indecency statutes of this sort are of ancient origin, and presently exist in at least 47 States. Public indecency, including nudity, was a criminal offense at common law, and this Court recognized the common law roots of the offense of 'gross and open indecency' in Winters v. New York, 333 U.S. 507, 515 (1948). Public nudity was considered an act *malum en se*. Le Roy v. Sidley, 1 Sid. 168, 82 Eng. Rep. 1036 (K.B. 1664). Public indecency statutes such as the one before us reflect moral disapproval of people appearing in the nude among strangers in public places.").

- 13 -

"marginally" within the "outer perimeters" of the First Amendment, Barnes, 501 U.S. at 566) is the erotic message implicit in nude or semi-nude dancing. There is no general right to take one's clothes off in public. Nor is there a constitutional right to wear pasties and G-strings rather than the lingerie-like tops and bottoms required by the Henrico ordinance. Thus, we cannot ask whether requiring slightly more clothes restricts the erotic dancer's right to be less clothed. "Being 'in a state of nudity,'" after all, "is not an inherently expressive condition." Erie, 529 U.S. at 289. Instead, we must ask whether the ordinance unduly burdens the dancer's ability to express her erotic message by requiring her to cover up slightly more of her body with slightly more fabric.

Erie held that going from complete nudity to being partly clothed (with pasties and a G-string) involved a *de minimis* impact on the ability of a dancer to express eroticism. Erie, 529 U.S. at 294. The Henrico ordinance, in contrast, does not involve a transition from totally nude to partly clothed, but rather one from partly clothed to slightly more partly clothed. If going from naked to non-naked involves a constitutionally insignificant difference in degree, then the incrementally more fabric required by the Henrico ordinance can hardly constitute a constitutionally fatal difference. In this respect, the Henrico ordinance involves no more of a burden on the dancer's free speech than the Erie requirement to wear some form of clothing in the first place. The dancer's erotic message still reaches its intended audience. The additional clothing just "makes the message slightly less graphic." Barnes, 501 U.S. at 571.

In other words, the pasties and G-string requirement should be understood as the "bare minimum necessary to achieve the state's purpose." Barnes, 501 U.S. at 572. It necessarily follows that this requirement does not represent "the maximum requirements of dress that an anti-nudity ordinance may impose." Café 207 v. St. Johns County, 856 F. Supp. 641, 645-46 (M.D. Fla. 1994), aff'd, 66 F.3d 272 (11th Cir. 1995); see also Bright Lights v. City of Newport,

830 F. Supp. 378, 383-84 (E.D. Ky. 1993). Thus, by going slightly beyond the pasties and G-string requirement, the Henrico public nudity ordinance did not so prejudice the eroticism inherent in the dancer's expressive conduct as to run afoul of the First Amendment.

Moreover, in determining whether "particular conduct possesses sufficient communicative elements to bring the First Amendment into play," we should consider not only the messenger's intent but also whether "the likelihood was great that the message would be understood by those who viewed it." Texas v. Johnson, 491 U.S. 397, 404 (1989) (quoting Spence v. Washington, 418 U.S. 405, 410-11 (1974)). Along these same lines, we do not accept appellants' unstated assumption that the more graphic the dancer's display of nudity the more erotic her message necessarily becomes. While that may be true at the extremes (like the contrast between a dancer in a snow skiing suit and one completely naked), it is not true at the margins (like the contrast between a dancer wearing almost nothing and one wearing slightly more than almost nothing).

### B. *The Ordinance Is Not Void For Vagueness.*

An enactment may be found void for vagueness under either of two related theories. See Hill v. Colorado, 530 U.S. 703, 732 (2000). First, if a statute "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" it may be found vague. Id. Second, an enactment may be found vague if "it authorizes or even encourages arbitrary and discriminatory enforcement." Id.

Appellants assert both vagueness infirmities with Henrico's public nudity ordinance. On the first point, appellants contend that Henrico officials never gave appellants any advance warning that their conduct violated the public nudity ordinance. County officials, however, did not have to give the erotic club or any of its dancers specific notice of the ordinance. The mere promulgation of the ordinance was notice to all. See generally Bryan v. United States, 524 U.S.

- 15 -

184, 196 (1998) (recognizing the "traditional rule that ignorance of the law is no excuse"). "The determination whether a criminal statute provides fair warning of its prohibitions must be made on the basis of the statute itself and the other pertinent law, rather than on the basis of an *ad hoc* appraisal of the subjective expectations of particular defendants." Bouie v. Columbia, 378 U.S. 347, 355 n.5 (1964). Under settled law, therefore, we must apply "an objective test for determining whether a statute is vague." Laurence H. Tribe, Constitutional Law § 12-31, at 1033 n.3 (2d ed. 1988).

The proper test focuses on whether a reasonable person could have understood what the Henrico public nudity ordinance literally proscribed. See Hill, 530 U.S. at 733. The Virginia Supreme Court resolved that issue in Wayside Rest., Inc. v. Virginia Beach, 215 Va. 231, 236, 208 S.E.2d 51, 55 (1974). There, an erotic club challenged a similar public nudity ordinance on vagueness grounds. The Virginia Supreme Court held that the challenged terms in the ordinance were "in common use" and "readily understood by the average person." Id. The Henrico ordinance uses nearly identical language, having been patterned (the evidence at trial proved) expressly after the Virginia Beach ordinance approved by Wayside Rest., Inc.

For example, the Henrico ordinance defines a "state of nudity" in a manner similar to the public nudity ordinance in Wayside Rest., Inc., 215 Va. at 232 n.1, 208 S.E.2d at 52 n.1. The words used in the definition section of the public nudity ordinance — "buttocks," "female breast," "top of the nipple" and the like — are commonly understood terms. Cf. Code § 18.2-390(2) (using identical language to define nudity). Similarly, the theater exemption in the Henrico ordinance tracks verbatim the exemption in Wayside Rest., Inc., 215 Va. at 232 n.1, 208 S.E.2d at 52 n.1. Indeed, the Virginia Supreme Court found that the most arguably ambiguous language in the exemption — the catch-all phrase "other similar establishment" following the list of artistic venues like plays, dramas, and theaters — was not unconstitutionally vague. Id. at

- 16 -

236, 208 S.E.2d at 55; see also Bomhower v. Virginia Beach, 76 F. Supp. 2d 681, 686 (E.D. Va. 1999) (rejecting similar vagueness challenge to a public nudity ordinance).

In addition, a specific "scienter requirement" in an ordinance (requiring that criminal culpability be grounded on knowing violations of law) further protects a law from a vagueness challenge. Hill, 530 U.S. at 732. A scienter requirement "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982). The Henrico ordinance contains a specific scienter requirement that the accused must "knowingly, voluntarily and intentionally" be in public in a "state of nudity." Henrico County Code § 13-107(b). This scienter requirement, built into the text of the ordinance, further undermines appellants' claim of inadequate notice.

We also disagree with appellants' argument that the vagueness test should turn on whether the Henrico ordinance applies to "technical" violators like women wearing "contemporary swimwear" or "short-shorts," or mothers engaged in breast feeding. As the United States Supreme Court recently emphasized, "speculation about possible vagueness in hypothetical situations not before the Court" should be given no weight in the analysis. Hill, 530 U.S. at 733 (citing United States v. Raines, 362 U.S. 17, 23 (1960)). "There is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question," id. (quoting Am. Communications Ass'n. v. Douds, 339 U.S. 382, 412 (1950)), but the focus must remain on the facts before the court.

As a result, one "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Hoffman Estates, 455 U.S. at 495; see also Parker v. Levy, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); Bomhower, 76 F. Supp. 2d at 686

- 17 -

(holding that an erotic club, against which the public nudity ordinance clearly applied, could not assert vagueness claim on behalf of others). The erotic dancers in this case stripped down to pasties and G-strings. They were not wearing "contemporary swimwear" or "short-shorts." Nor were they breast feeding on stage. Because the very "nature of judicial review constrains us to consider the case that is actually before us," McConnell v. FEC , 540 U.S. ___, 124 S.Ct. 619, ___, 2003 U.S. LEXIS 9195, at *179 (2003) (citation omitted), we decline appellants' invitation to offer an advisory opinion on such "hypothetical situations," Hill, 530 U.S. at 733 (citation omitted).

We likewise disagree that the ordinance violated the vagueness test on the ground that "it authorizes or even encourages arbitrary and discriminatory enforcement." Hill, 530 U.S. at 732. Because law enforcement always "requires the exercise of some decree of police judgment," Grayned v. City of Rockford, 408 U.S. 104, 114 (1972), a law should not be invalidated unless its clarity has been "designedly avoided so as to allow the net to be cast at large," Papachristou v. City of Jacksonville, 405 U.S. 156, 166 (1972) (citation omitted).

On this issue, we see no persuasive point to be made over the fact that a police officer must see a particular item of clothing to determine whether to issue a summons. It is entirely appropriate for an officer to examine the conduct in question and make a judgment as to whether, under the probable cause standard, the conduct is illegal.[13] The vagueness test does not forbid

---

[13] Appellants claim the officers issued summonses to ten dancers on July 9, 2001, but arbitrarily allowed others to continue dancing. This disparity proves, appellants argue, the "unfettered discretion" given by the ordinance to law enforcement personnel. The truth is far less sinister, however. The Commonwealth's Attorney had instructed each officer to charge only those dancers committing the offense "in the officer's presence." After observing the first ten dancers, the undercover officers had to leave the bar, pick up their summons books, and then fill out the paperwork for each of these dancers. During this timeframe other dancers evidently continued to dance. These dancers were not charged because they did not commit the offense in the officers' presence. As the sergeant in charge testified, "we charged everybody that we saw in violation."

individualized assessments by law enforcement officers. What it forbids is a law that, by its expansive sweep of language, enacts an elastic definition of illegality — one that authorizes an officer to define for himself what is and is not legal. Nothing in the Henrico ordinance goes that far.

C.      *The County Did Not Engage*
*In Unlawful Selective Prosecution.*

Even if the public nudity ordinance survives the vagueness test, appellants argue, the County still violated equal protection principles by singling them out for selective prosecution. This assertion rests primarily on the prosecutor's concession that he would not prosecute "technical" violations of the ordinance which would include some forms of skimpy swimwear at public pools, nursing mothers in public, and the like. We reject this claim for three reasons.

First, the structure of tripartite government creates a judicial presumption in favor of "broad" prosecutorial discretion. See United States v. Armstong, 517 U.S. 456, 464-65 (1996). "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." Wayte v. United States, 470 U.S. 598, 607 (1985). "Even in the criminal-law field, a selective prosecution claim is a *rara avis*." Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 489 (1999). Thus, "[i]n the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion.'" Armstrong, 517 U.S. at 464 (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)).

"To succeed on a selective-prosecution claim, a defendant must demonstrate that the prosecutor's decision 'was based on an unconstitutional motive.'" Rowsey v. Lee, 327 F.3d 335, 343 (4th Cir. 2003) (citation omitted). In other words, a selective prosecution claim requires a showing that "the prosecutor has brought the charge for reasons forbidden by the Constitution." Armstrong, 517 U.S. at 463. The claim cannot succeed without proof that the prosecution was

"'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,' including the exercise of protected statutory and constitutional rights." Wayte, 470 U.S. at 608 (quoting Bordenkircher, 434 U.S. at 364, Oyler v. Boles, 368 U.S. 448, 456 (1962), and citing United States v. Goodwin, 457 U.S. 368, 372 (1982)) (citations omitted).

Appellants' as-applied selective prosecution claim fails for the same reason their content-based attack fails: The dancers have no First Amendment right to wear pasties and G-strings rather than the lingerie-like tops and bottoms required by the Henrico ordinance. Because the ordinance involves a content-neutral regulation of conduct that does not unduly burden any protected erotic speech, appellants cannot claim they were being targeted for constitutionally suspect reasons. Put another way, appellants cannot show that Henrico prosecuted them "*because of*" their expression of constitutionally protected speech. Wayte, 470 U.S. at 610 (emphasis in original).

Second, the selective prosecution claim, having been rejected by the factfinder at trial, can only succeed on appeal if the facts demonstrate it as a matter of law. The factual record cannot support this showing. No evidence proved any "technical violations" had in fact occurred in Henrico County. Appellants' argument on this point, as well as the prosecutor's remarks about it, involve purely hypothetical situations — the most fanciful being the observation that the enforcement of the public nudity ban would "permit Jennifer Lopez to wear one famously revealing dress," but might prohibit her from wearing others. See *post*, at 33 (quoting the federal court's abstention order). Once one gets beyond the hypotheticals, no evidence in this case demonstrated that the prosecutors had used the ordinance to target erotic dancing. Just the opposite was shown: Thirty-eight individuals had been prosecuted under the public nudity ban, and this one case involves the only application of the ordinance against erotic dancers.

Finally, even if the hypothetical "technical cases" were real, the secondary effects doctrine provides a constitutionally adequate basis for judicial deference to prosecutorial discretion where no underlying constitutional infringement exists. See generally Erie, 529 U.S. at 295 (recognizing "that one specific occurrence of public nudity — nude erotic dancing — is particularly problematic because it produces harmful secondary effects"). The impact on the local community of a strip club featuring erotic dancers can hardly be equated with nursing mothers in public restaurants, swimmers at a neighborhood pool, or, for that matter, a surprise visit from a scantily-clad Jennifer Lopez. For the same reason the secondary effects principle provides legitimacy to the governmental interest in regulating the business of erotica, it also explains why prosecutors may make commonsense distinctions between nursing mothers and swimmers, on the one hand, and erotic dancers, flashers, and public urinators, on the other.[14]

### D. *The County Had Authority To Enact A Public Nudity Ordinance.*

Appellants next claim that the Henrico public nudity ordinance exceeds the County's local governmental powers. We disagree and hold that the ordinance involves a legitimate exercise of delegable state police powers.

Under Code § 15.2-1200, a county may "adopt such measures as it deems expedient to secure and promote the health, safety and general welfare of its inhabitants which are not inconsistent with the general laws of the Commonwealth."[15] This delegation of police powers

---

[14] Appellants also contend on brief that the County does not inspect "high-brow" venues such as "art museums or ballets" for potential violations of the public nudity ordinance. We find this assertion unpersuasive. Even if the theatrical exemption in the public nudity ordinance did not expressly justify this alleged policy of nonenforcement, see *ante* at 8-11, no evidence in the record addresses (much less confirms) appellants' factual assertion.

[15] Under Dillon's Rule, localities may exercise "only those powers which are expressly granted by the state legislature, those powers fairly or necessarily implied from expressly granted powers, and those powers which are essential and indispensable." Arlington County v. White,

includes the power to regulate nude and semi-nude dancing.  See Wayside Rest., Inc., 215 Va. at 233, 208 S.E.2d at 53 (finding power implicit in county's power to prohibit "conduct which the local governing body reasonably deems to be contrary to the morals, health, safety and general welfare of the community"); see, e.g., Erie, 529 U.S. at 296 ("Erie's efforts to protect public health and safety are clearly within the city's police powers."); Barnes, 501 U.S. at 569 (recognizing that "the traditional police powers of the States," defined as "the authority to provide for the public health, safety, and morals," provides a legitimate basis for public indecency statutes).

We also reject appellants' assertion that the Henrico public nudity ordinance, while an otherwise valid expression of the general police power, should be invalidated because it goes further than state laws proscribing obscenity and indecent exposure.  See Code §§ 18.2-375, 18.2-387.  "The mere fact that the state, in the exercise of the police power, has made certain regulations, does not prohibit a municipality from exacting additional requirements."  Wayside Rest., Inc., 215 Va. at 234, 208 S.E.2d at 53 (quoting King v. Arlington County, 195 Va. 1084, 1090, 81 S.E.2d 587, 591 (1954)).  This remains true as long as the locality "does not attempt to authorize by the ordinance what the legislature has forbidden or forbid what the legislature has expressly licensed, authorized, or required."  Id. at 234, 208 S.E.2d at 54.

### E.  *The Evidence Supports The Trial Court's Findings Of Fact.*

Finally, appellants argue the trial court plainly erred in finding that their semi-nude dancing did not fall within the ordinance's exemption for the performance of any "play, ballet, drama, tableau, production or motion picture in any theater, concert hall, museum of fine arts, school, institution of higher learning or other similar establishment which is primarily devoted to

---

259 Va. 708, 712, 528 S.E.2d 706, 708 (2000) (quoting City of Virginia Beach v. Hay, 258 Va. 217, 221, 518 S.E.2d 314, 316 (1999) (citations omitted)).

such exhibitions, presentations, shows or performances as a form of expression of opinion, communication, speech, ideas, information, art or drama." Henrico County Code § 13-107(c). The trial court found as a fact that Gold City was not a "theater," and the dancers were not engaged in any "theatrical performance either." These conclusions, appellants contend, fail to take into account their unique "moves using the pole mounted on the bar," the "special costumes" worn (albeit briefly) during the dance, as well as the overall context of their dancing.

The trial judge's factual findings cannot be disturbed on appeal unless no "rational trier of fact" could have come to the conclusions he did. Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); Holmes v. Commonwealth, 41 Va. App. 690, 691, 589 S.E.2d 11, 11 (2003); Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003). That cannot be said here. The dancers took their clothes off on the bar, not a theatrical stage. They did not use scripts, read lines, or sing. No one passed out playbills or programs. No stage hands set up props or made scene changes. No evidence suggests that the audience came to see a "play, ballet, drama, tableau, production or motion picture" or showed up at Gold City thinking it was a "theater" or similar establishment under Henrico County Code § 13-107(c). The trial court, therefore, was not plainly wrong in finding the theatrical exemption inapplicable.

III.

Finding no error in either the trial court's legal reasoning or the rationality of its factfinding, we affirm.

*Affirmed.*

- 23 -

Fitzpatrick, C.J., with whom Benton and Elder, JJ., join, dissenting.

I respectfully dissent from the majority opinion. Appellants contend that the ordinance is unconstitutional both on its face and as applied in these cases because it violates their First Amendment rights to free speech and association, violates the enabling statute and that the evidence was insufficient to support the convictions. Because I would decide this case on the basis of the content-based selective enforcement, I address that issue only and would not reach the other assignments of error addressed by the majority.[16]

"Two conflicting rights are involved in [these] appeal[s]: (1) the right to free, individual self-expression, and (2) a government's right to enact legislation for the safety and welfare of its citizens." Adams Outdoor Adv. v. City of Newport News, 236 Va. 370, 381, 373 S.E.2d 917, 922 (1988).

> The First Amendment of the Constitution provides: "Congress shall make no law abridging the freedom of speech." This freedom is among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action; and municipal ordinances adopted under state authority constitute state action.

Staub v. City of Baxley, 355 U.S. 313, 321 (1958). "[T]he First Amendment needs breathing space[;] . . . statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." Broadrick v. Oklahoma, 413 U.S. 601, 611-12 (1973). "In assessing the constitutionality of a statute, we must presume that the legislative action is valid. The burden is on the challenger to prove the alleged constitutional defect." Woolfolk v. Commonwealth, 18 Va. App. 840, 848, 447 S.E.2d 530, 534 (1994).

---

[16] Appellants assert several additional constitutional arguments, including that the ordinance constitutes a regulatory taking. However, these arguments were not raised in the trial court and thus are waived. Rule 5A:18.

Vagueness and Lack of Fair Notice

As applied to them, appellants contend the ordinance violates the First Amendment because it is unconstitutionally vague, and it impermissibly regulates content. I agree.

"Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." Chicago v. Morales, 527 U.S. 41, 56 (1999). While the County can regulate the conduct involved here, it "must clearly define the proscribed conduct and must . . . enforce[ ] [the ordinance] equally, and not arbitrarily or capriciously, when it is applicable." Colonial First Properties v. Henrico County Virginia, 166 F. Supp. 2d 1071, 1090 (E.D. Va. 2001).

"It is a basic principle of due process that an enactment is [unconstitutional] if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). "[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." Id.

The record proves that the County failed to give Gold City "a reasonable opportunity to know what is prohibited" under the ordinance. The Commonwealth's Attorney conceded that he would not prosecute people wearing "contemporary swimwear" or "short-shorts," although these items fall within the prohibitions of the ordinance. Moreover, the Commonwealth's Attorney agreed that a mother breast feeding her baby in public would be a violation of the ordinance.[17] Therefore, prior to this prosecution, there was no way for appellants to determine what clothing

---

[17] The County correctly notes that breast feeding is statutorily exempted from the indecent exposure statute, so no prosecution could follow under state Code § 18.2-387. Nevertheless, breast feeding would be what the Commonwealth's Attorney described as a "technical" violation of the county ordinance.

would put them in violation of the ordinance. Indeed, although the County was aware of Gold City's proposed format, the County never gave appellants any advance warning that their conduct would constitute a violation of the ordinance.[18]

The evidence adduced at the federal court hearing showed the events leading up to the opening of Gold City and the issuing of summons on July 6 and July 8 to be as follows:

> (1) a week before Gold City opened for business, Gold City informed some of the County's highest-ranking officials of the mode of dancing ("pasties and Gstring" [sic]) to be performed; (2) at the same time Gold City explained to those officials the view that Gold City was covered by an exception to the Ordinance; (3) the Acting Chief of Police represented that he was uncertain about the matter, but would look into it; (4) he [did] so; (5) the same afternoon, the County Attorney and the Commonwealth's Attorney and the Acting Chief of Police had concluded that Gold City: (a) was wrong in its interpretation of the Ordinance; (b) the mode of dancing Gold City would use was in violation of the Ordinance; and (6) the County never informed Gold City of these views.

Colonial First Properties, 166 F. Supp. 2d at 1082. "Remarkably, and for reasons neither expressed nor readily apparent, Gold City was not notified that the County's executives and law enforcement officials had determined that Gold City's proposed operational format violated the Ordinance." Id. at 1074.

Furthermore, the record indicates that neither the Commonwealth's Attorney nor the police were able to clearly delineate what would constitute a violation of the ordinance or at least what they would prosecute as a violation. During cross-examination, one officer stated that he would have to see a particular item of clothing before he could state whether it would be in violation of the ordinance and that the determination would be made on "a case-by-case basis." Another officer testified that liability under the ordinance would depend on "what type of

---

[18] There is a discussion of this issue in the federal court opinion; the federal judge found the County's actions in this regard "unreasonable, unbecoming of government and unfair." Colonial First Properties, 166 F. Supp. 2d at 1082.

G-string [a person] was wearing." Thus, the application of the ordinance did not clearly define the proscribed conduct and vested an unacceptable level of discretion in the hands of those charged with enforcing it. Appellants did not have "a reasonable opportunity to know what [conduct was] prohibited" prior to the police issuing summonses on July 6, 2001. Grayned, 408 U.S. at 108.

### Arbitrary Enforcement

The facts adduced at trial clearly prove that the ordinance violates "the requirement that a legislature establish minimal guidelines to govern law enforcement." Kolender v. Lawson, 461 U.S. 352, 358 (1983). The Commonwealth's Attorney conceded that he would not prosecute "technical" violations of the ordinance. He did not, however, state how he would distinguish between a "technical" violation and those before the trial court. Instead, he conceded that the prosecutions at issue here were driven by his opinion of the content of the performances at Gold City. Essentially, the County prosecutors and law enforcement personnel exercised their own discretion "on an *ad hoc* and subjective basis." Grayned, 408 U.S. at 109. As appellants noted in the trial court, "the [ordinance] says one thing. [The Commonwealth is] going to prosecute something else."

Lastly, one of the officers stated that while they were issuing summonses, other Gold City dancers who were in violation of the ordinance continued to perform, but were not cited. Rather than continuing to issue summonses, the officer "just brought it to Ms. White's attention that the way they were dressed they were still in violation and that she had to bring them into compliance." Hence, I conclude there was selective enforcement of the ordinance both as to Gold City generally and with respect to particular dancers in Gold City. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on

an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned, 408 U.S at 108-09.

Content-based Regulation

"To safeguard free speech, the Supreme Court requires that a regulatory measure be content neutral. The doctrine of content neutrality provides that governmental regulations may not 'restrict expression because of its message, its ideas, its subject matter, or its content.'" Adams Outdoor Adv., 236 Va. at 381, 373 S.E.2d at 922 (citing Police Dept. of City of Chicago v. Mosley, 408 U.S. 92, 95 (1972)).

The Commonwealth's Attorney's subjective opinion demonstrated that the prosecutions in these cases were based "primarily" upon his opinion of the *content* of the performances. This focus on the content of appellants' conduct at Gold City renders the County's application of the ordinance in these cases unconstitutional.

"[N]ude [or semi-nude] dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so." Barnes v. Glen Theater, Inc., 501 U.S. 560, 566 (1991). Accordingly, "government restrictions on public nudity such as the ordinance at issue here should be evaluated under the framework set forth in [United States v.] O'Brien [, 391 U.S. 367 (1968),] for content-neutral restrictions on symbolic speech." Erie v. Pap's A.M., 529 U.S. 277, 289 (2000). That test provides that

> a government regulation is sufficiently justified if it is within the
> constitutional power of the Government; if it furthers an important
> or substantial governmental interest; if the governmental interest is
> unrelated to the suppression of free expression; and if the
> incidental restriction on alleged First Amendment freedoms is no
> greater than is essential to the furtherance of that interest.

O'Brien, 391 U.S. at 377. Appellants conceded at trial that the County "surely" has the authority to enact the ordinance. Thus, the first prong in O'Brien is met. Appellants argue, however, that

the ordinance does not further a substantial government interest; it is impermissibly related to the suppression of protected expressive conduct, namely erotic dancing; and that it is not sufficiently narrowly tailored to satisfy O'Brien.

The second part of the O'Brien test requires that the ordinance further a substantial government interest.   I agree with the majority's conclusion that the ordinance "furthers a substantial government interest in protecting order and morality." Id.  Therefore, the ordinance satisfies O'Brien's second requirement.

Under the third prong of O'Brien "the governmental interest must be unrelated to the suppression of free expression." Barnes, 501 U.S. at 570.  Although the purpose for which the ordinance was adopted satisfies this requirement, the application of the ordinance in these cases is problematic.  Henrico County adopted the ordinance in 1982 to combat the problems of public urination, exposure of the buttocks (i.e., "mooning") and skinny dipping.[19]  The ordinance provides:

> (a) As used in this section, the term "state of nudity" means a state of undress so as to expose the human male or female genitals, pubic area or buttocks or to cover any of them with less than a fully opaque covering, or the showing of the female breast or any portion thereof below the top of the nipple, or covering of the breast or any portion thereof below the top of the nipple with less than a fully opaque covering.
> (b) Every person who knowingly, voluntarily and intentionally appears in public or in a public place or in a place open to the public or open to public view in a state of nudity, or employs, encourages or procures another person so to appear, shall be guilty

---

[19] Included in the record are 1982 staff memoranda from the Henrico County police discussing the need for an ordinance to prosecute "urinating or defecating in public, swimming in the nude in public, exposing one's buttocks (mooning) in public, or generally being nude in public." Inter-Office Memorandum from Lieutenant C.S. McCray, Platoon A, Henrico County Police Department, to Chief of Police (July 8, 1982).  Another member of the police force noted that "we do need some type of ordinance to control urinating in public." Inter-Office Memorandum from Colonel L.T. Sheppard, Henrico County Police Department, to Commonwealth's Attorney and County Attorney (July 12, 1982).  The Henrico County Board of Supervisors unanimously approved the ordinance on September 8, 1982.  Minutes, Henrico County, Virginia Board of Supervisors (Sept. 8, 1982).

of a misdemeanor punishable by confinement in jail for not more than six months or a fine of not more than $500.00, or both.

(c) Nothing contained in this section shall be construed to apply to the exhibition, presentation, showing or performance of any play, ballet, drama, tableau, production or motion picture in any theater, concert hall, museum of fine arts, school, institution of higher learning or other similar establishment which is primarily devoted to such exhibitions, presentations, shows or performances as a form of expression of opinion, communication, speech, ideas, information, art or drama.

Henrico County Code § 13-107. In contrast, the ordinances at issue in Barnes and Pap's A.M. were flat bans on all public nudity and specifically required dancers to wear G-strings and pasties. Barnes, 501 U.S. at 563; Pap's A.M., 529 U.S. at 284.

> The ordinance here, like the statute in Barnes, is on its face a general prohibition on public nudity. By its terms, the ordinance regulates conduct alone. It does not target nudity that contains an erotic message; rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity.

Pap's A.M., 529 U.S. at 290. Furthermore, the ordinance in Pap's A.M. specifically included theaters and dance halls. Thus, they satisfied the third prong of the O'Brien test, because they were directed solely at conduct without reference to expression.[20]

In the instant cases, subsection (c) of the ordinance creates certain exemptions for nude performances, including those performed in theaters. The Commonwealth's Attorney stated that he did not believe Gold City fell within subsection (c) based on his opinion of the content of the performances at Gold City. This express reference to content brings the County's enforcement

---

[20] While the majority argues that the outcome of the instant case is controlled by Wayside Rest., Inc. v. City of Virginia Beach, 215 Va. 231, 208 S.E.2d 51 (1974), I disagree. Wayside was decided over twenty years before the United States Supreme Court's decisions in Barnes and Pap's A.M. Additionally, because this dissent is grounded in a selective enforcement analysis only, I do not address appellants' broader constitutional challenges. As the Supreme Court stated in Wayside, "[W]e reserve decision to another day, upon full and adequate record, on any concrete problems of constitutional dimension under the First Amendment which might arise from future application of the ordinance." Id. at 236, 208 S.E.2d at 55. They did not, in that case, reach this issue.

of the ordinance into the realm of First Amendment protections because those enforcing the ordinance must make content-based distinctions. See, e.g., Texas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); Iota Xi v. George Mason University, 993 F.2d 386 (4th Cir. 1993) (an exception for theatrical productions cannot be limited "to protect only a narrow and limited category of professionally produced plays" rather, even "crude and amateurish and perhaps unappealing" performances "come within the First Amendment's reach"); see also Barnes, 501 U.S. at 594 ("While the entertainment afforded by a nude ballet at Lincoln Center to those who can pay the price may differ vastly in content (as viewed by judges) or in quality (as viewed by critics), it may not differ in substance from the dance viewed by the person who wants some 'entertainment' with his beer or shot of rye.") (White, J. dissenting).

As applied by the County in the instant cases, the ordinance delineates a type of expressive conduct permitted under limited circumstances and bans other types of expressive conduct that fall within the First Amendment's protection, albeit on the "outer limits" of such protection. The County argues that the exemption in subsection (c) is a "time, place and manner" regulation. Although this argument has appeal, given the express limitations on venue, the County's enforcement in these cases does not satisfy the "alternative avenues of communication" requirement for time, place and manner regulations. City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47 (1986).[21] The County's application of the ordinance does not provide for an alternative venue within the County to convey the "erotic message," as required by the United States Supreme Court.

---

[21] In addition, "time, place and manner" regulations must also be content-neutral and narrowly tailored. See Ward v. Rock Against Racism, 491 U.S. 781 (1989).

The fourth prong of O'Brien requires "the incidental restriction on alleged First Amendment freedoms [be] no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 377. This prong highlights another important distinction between the instant cases and Barnes and Pap's A.M. In the latter, exotic dancing in pasties and G-strings was permitted; however, the dancers sought instead to dance completely nude. In upholding the ordinances in both cases, the Court held that "any incidental impact on the expressive element of nude dancing is *de minimis*. The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message." Pap's A.M., 529 U.S. at 301; see also Barnes, 501 U.S. at 572 ("requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose").

In the instant cases, the legislative intent underlying the ordinance was to prevent urinating in public and similar problems. The County conceded that exotic dancing was not the activity it sought to regulate when the ordinance was adopted. Viewed in the context of its legislative history, the ordinance as applied is not narrowly drawn so that the incidental restriction on the expressive conduct at issue is no greater than is essential to prevent or deter public urination, "mooning" or skinny dipping.

In summary, I agree with the U.S. District Court's reasoning that

> [T]he Supreme Court of the United States views nude dancing [as] expressive conduct that is entitled to some quantum of protection under the First Amendment. Hence, though the subject matter here is, as the Plaintiffs admit, mundane, it involves a well-settled right under the First Amendment. The exercise of that right may be circumscribed by local law, but the law, as applied, must allow the conduct permitted by the First Amendment. The law, of course, must clearly define the proscribed conduct and must be enforced equally, and not arbitrarily or capriciously, when it is applicable. When measured against these precepts, the Ordinance is troublesome. On its face, as admitted by the Commonwealth's Attorney, the Ordinance would make it unlawful for a mother to

- 32 -

nurse her child in public, conduct that often occurs in today's society and that is widely accepted. It, by admission of the Commonwealth's Attorney, would prohibit the wearing of bathing suits commonly sold in the County and worn at its public pools and at private clubs, though the Ordinance would not necessarily be enforced against each technical violation. Though admitting that both were technically violative of the Ordinance, the Commonwealth's Attorney would permit Jennifer Lopez to wear one famously revealing dress, but prohibit her from wearing another as to which it is difficult to discern a difference. Some of these violations would be prosecuted; others would not.
The Ordinance contains a provision, section (c), that permits the very conduct engaged in by and at Gold City to be performed in a different, but nonetheless public, venue. Mr. Kizer testified that, while a ballet at a dance hall, featuring completely nude dancers for the duration of the performance, would not be prohibited by the Ordinance, dancing in pasties and G-strings on the stage at Gold City does not fall under the exception. Section (c) has serious exposure to constitutional challenge as to its application, especially in perspective of Mr. Kizer's testimony that the content of constitutionally protected expressive conduct plays a role in assessing whether that conduct violates the Ordinance.

Colonial First Properties, 166 F. Supp. 2d at 1090.

I would reverse the judgment of the trial court and dismiss the convictions.

- 33 -

                                    Tuesday                22nd

        July, 2003.


Sharon C. Boyd,                                              Appellant,

  against        Record No. 0377-02-2
                 Circuit Court Nos. CR01-3510-00-M and
                  CR01-3511-00-M

County of Henrico,                                           Appellee.


Dianna Lee White,                                           Appellant,

  against        Record No. 0380-02-2
                 Circuit Court No. CR01-3519-00-M

County of Henrico,                                           Appellee.


Donna Jean White,                                           Appellant,

  against        Record No. 0381-02-2
                 Circuit Court No. CR01-3520-00-M

County of Henrico,                                           Appellee.


Upon a Petition for Rehearing En Banc

Before Judges Benton, Elder, Annunziata, Bumgardner, Frank, Humphreys, Clements, Felton,
Kelsey and McClanahan


        On June 23, 2003 came the appellee, by counsel, and filed a petition praying that

the Court set aside the judgment rendered herein on June 10, 2003, and grant a rehearing en banc

thereof.

        On consideration whereof, the petition for rehearing en banc is granted, the

mandate entered herein on June 10, 2003 is

                                    - 34 -

stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellee shall attach as an addendum to the opening brief upon rehearing en banc a copy of the opinion previously rendered by the Court in this matter.  It is further ordered that the appellee shall file with the clerk of this Court fourteen additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Fitzpatrick, Judges Benton and Kelsey
Argued at Richmond, Virginia

SHARON C. BOYD

v.     Record No. 0377-02-2

COUNTY OF HENRICO

DIANNA LEE WHITE

OPINION BY
v.     Record No. 0380-02-2       CHIEF JUDGE JOHANNA L. FITZPATRICK
JUNE 10, 2003

COUNTY OF HENRICO

DONNA JEAN WHITE

v.     Record No. 0381-02-2

COUNTY OF HENRICO

FROM THE CIRCUIT COURT OF HENRICO COUNTY
George F. Tidey, Judge

C. David Whaley (Anthony G. Spencer; Morchower, Luxton &
Whaley, on briefs), for appellants.

Michael V. Gerrard, Deputy Commonwealth's Attorney, for
appellee.

Appellant Sharon Boyd (Boyd) was convicted in a bench trial of two counts of public

nudity, and appellants Donna White and Dianna White were convicted of aiding and abetting

public nudity, in violation of Henrico County Code § 13-107. Appellants contend that Henrico

County Code § 13-107, the public nudity ordinance (hereinafter "ordinance"): (1) is

unconstitutional both facially and as applied to them; (2) violates the enabling statute; and (3)

that the evidence was insufficient to support the convictions. For the reasons that follow, we reverse the judgment of the trial court.

## I. Factual Background

The facts are undisputed. On July 6, 2001 plainclothes officers from the Henrico County Police Department went to Gold City Showgirls (Gold City), a "restaurant and bar," which had just opened for business. The officers paid a cover charge, showed identification and entered the bar area, where they stayed for approximately ninety minutes. During that time, the officers saw ten women strip to "pasties" and G-strings. The officers left the bar, retrieved their summons books and badges and returned to issue summonses to the first ten dancers, including Boyd, and the club manager, Donna White, for violating the ordinance.[22] While the officers issued the summonses, other women continued dancing. Although these other dancers were not among the ten dancers cited for violating the ordinance, they were warned to comply with the ordinance and were told they would be cited if they failed to do so. On July 8, 2001 the police observed the same type of dancing and dress and again issued summonses for violations of the ordinance to Boyd and Dianna White, who was the manager on duty.

Appellants were tried and convicted in the Henrico County General District Court. On appeal to the Henrico County Circuit Court appellants argued that the ordinance was unconstitutional, both facially and as applied in this case. As part of the stipulated evidence, the Commonwealth and the appellants agreed that the transcript of evidence presented in a parallel

---

[22] Henrico County Code § 13-107 makes it a misdemeanor to:
> expose the human male or female genitals, pubic area or buttocks or to cover any of them with less than a fully opaque covering, or the showing of the female breast or any portion thereof below the top of the nipple, or covering of the breast or any portion thereof below the top of the nipple with less than a fully opaque covering.

Henrico County Code § 13-107(a).

case in the United States District Court in Richmond would be admitted as evidence in the instant cases.[23] The Commonwealth's Attorney conceded before the U.S. District Court that he would not prosecute people wearing "contemporary swimwear" or "short-shorts," despite the fact that those items would be in "technical" violation of the statute. He also stated that he pursued the instant prosecutions based "primarily" on his opinion of the content of the performances at Gold City.

The trial court rejected appellants' constitutional challenges and heard the cases on the merits. Appellants admitted the dancers wore "pasties" and G-strings on July 6 and July 8, 2001. They argued, however, that they were not liable under the ordinance because Gold City fell within the ordinance's "theater" exception.[24] The trial court found that Gold City "[was] not a theater" and that the performance was not "a theatrical performance either." Boyd was convicted of two counts of public nudity and sentenced to a fine of $125, plus costs. Appellants Donna White and Dianna White were each convicted of aiding and abetting public nudity and sentenced

---

[23] See Colonial First Properties, LLC v. Henrico County Virginia, 166 F. Supp. 2d 1071 (E.D. Va. 2001). In the federal case, some of the owners of Gold City challenged the constitutional validity of the ordinance and sought injunctive relief. There is an extensive discussion of the background surrounding the licensure and opening of Gold City in the federal court's opinion. While the federal court found the ordinance "troublesome," it abstained from deciding the constitutional question to give Virginia courts an opportunity to resolve the matter. See id.

[24] Under the ordinance, there is an exception for theatrical and dramatic performances.
> Nothing contained in this section shall be construed to apply to the exhibition, presentation, showing or performance of any play, ballet, drama, tableau, production or motion picture in any theater, concert hall, museum of fine arts, school, institution of higher learning or other similar establishment which is primarily devoted to such exhibitions, presentations, shows or performances as a form of expression of opinion, communication, speech, ideas, information, art or drama.

Henrico County Code § 13-107(c).

to 10 days in jail, with 10 days suspended, and fined $500, with $250 suspended, and costs of $61. Appellants now challenge those convictions.

## II. Constitutionality of the Public Nudity Ordinance

Appellants contend that the ordinance is unconstitutional both on its face and as applied in these cases because it violates their First Amendment rights to free speech and association. Since we decide this case on the basis of the content-based selective enforcement, we do not address the facial challenge to the ordinance or appellants' other assignments of error.[25]

"Two conflicting rights are involved in [these] appeal[s]: (1) the right to free, individual self-expression, and (2) a government's right to enact legislation for the safety and welfare of its citizens." Adams Outdoor Adv. v. City of Newport News, 236 Va. 370, 381, 373 S.E.2d 917, 922 (1988).

> The First Amendment of the Constitution provides: "Congress shall make no law abridging the freedom of speech." This freedom is among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action; and municipal ordinances adopted under state authority constitute state action.

Staub v. City of Baxley, 355 U.S. 313, 321 (1958). "[T]he First Amendment needs breathing space[;] . . . statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." Broadrick v. Oklahoma, 413 U.S. 601, 611-12 (1973). "In assessing the constitutionality of a statute, we must presume that the legislative action is valid. The burden is on the challenger to prove the alleged constitutional defect." Woolfolk v. Commonwealth, 18 Va. App. 840, 848, 447 S.E.2d 530, 534 (1994).

---

[25] Appellants' additional assignments of error were that the ordinance is facially invalid, that it violates the enabling statute and that the evidence was insufficient to support the convictions.

Vagueness and Lack of Fair Notice

As applied to them, appellants contend the ordinance violates the First Amendment because it is unconstitutionally vague, and it impermissibly regulates content.[26]  We agree.

"Vagueness may invalidate a criminal law for either of two independent reasons.  First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement."  Chicago v. Morales, 527 U.S. 41, 56 (1999).  While the County can regulate the conduct involved here, it "must clearly define the proscribed conduct and must . . . enforce[ ] [the ordinance] equally, and not arbitrarily or capriciously, when it is applicable."  Colonial First Properties, LLC v. Henrico County Virginia, 166 F. Supp. 2d 1071, 1090 (E.D. Va. 2001).

"It is a basic principle of due process that an enactment is [unconstitutional] if its prohibitions are not clearly defined."  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  "[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning."  Id.

The record proves that the County failed to give Gold City "a reasonable opportunity to know what is prohibited" under the ordinance.  The Commonwealth's Attorney conceded that he would not prosecute people wearing "contemporary swimwear" or "short-shorts," although these items fall within the limitations of the ordinance.  Moreover, the Commonwealth's Attorney agreed that breast feeding in public would be a violation of the ordinance.[27]  Therefore, prior to

---

[26] Appellants assert several additional constitutional arguments, including that the ordinance constitutes a regulatory taking.  However, these arguments were not raised in the trial court, and the ends of justice do not compel us to address them for the first time on appeal.  Those arguments are, therefore, waived.  Rule 5A:18.

[27] The County correctly notes that breast feeding is statutorily exempted from the indecent exposure statute, so no prosecution could follow under state Code § 18.2-387.

this prosecution, there was no way for appellants to determine what clothing would put them in violation of the ordinance. Indeed, although the County was aware of Gold City's proposed format, the County never gave appellants any advance warning that their conduct would constitute a violation of the ordinance.[28]

The evidence adduced at the federal court hearing showed the events leading up to the opening of Gold City and the issuing of summonses on July 6 and July 8 to be as follows:

> (1) a week before Gold City opened for business, Gold City informed some of the County's highest-ranking officials of the mode of dancing ("pasties and Gstring" [sic]) to be performed; (2) at the same time Gold City explained to those officials the view that Gold City was covered by an exception to the Ordinance; (3) the Acting Chief of Police represented that he was uncertain about the matter, but would look into it; (4) he [did] so; (5) the same afternoon, the County Attorney and the Commonwealth's Attorney and the Acting Chief of Police had concluded that Gold City: (a) was wrong in its interpretation of the Ordinance; (b) the mode of dancing Gold City would use was in violation of the Ordinance; and (6) the County never informed Gold City of these views.

Colonial First Properties, 166 F. Supp. 2d at 1082. "Remarkably, and for reasons neither expressed nor readily apparent, Gold City was not notified that the County's executives and law enforcement officials had determined that Gold City's proposed operational format violated the Ordinance." Id. at 1074.

Furthermore, the record indicates that neither the Commonwealth's Attorney nor the police were able to clearly delineate what would constitute a violation of the ordinance or at least what they would prosecute as a violation. During cross-examination, one officer stated that he

---

Nevertheless, breast feeding would be what the Commonwealth's Attorney described as a "technical" violation of the county ordinance.

[28] There is a discussion of this issue in the federal court opinion; the federal judge found the County's actions in this regard "unreasonable, unbecoming of government and unfair." Colonial First Properties, 166 F. Supp. 2d at 1082.

would have to see a particular item of clothing before he could state whether it would be in violation of the ordinance and that the determination would be made on "a case-by-case basis." Another officer testified that liability under the ordinance would depend on "what type of G-string [a person] was wearing." Thus, the application of the ordinance did not clearly define the proscribed conduct and vested total discretion in the hands of those charged with enforcing it. Appellants did not have "a reasonable opportunity to know what [conduct was] prohibited" prior to the police issuing summonses on July 6, 2001. Grayned, 408 U.S. at 108.

Arbitrary Enforcement

The facts adduced at trial, including the incorporated testimony from the federal hearing, clearly prove that the ordinance violates "the requirement that a legislature establish minimal guidelines to govern law enforcement." Kolender v. Lawson, 461 U.S. 352, 358 (1983). The Commonwealth's Attorney conceded that he would not prosecute "technical" violations of the ordinance. He did not, however, state how he would distinguish between a "technical" violation and those before the trial court. Instead, he conceded that the prosecutions at issue here were driven by his opinion of the content of the performances at Gold City. Essentially, the County prosecutors and law enforcement personnel exercised their own discretion "on an ad hoc and subjective basis." Grayned, 408 U.S. at 109. As appellants noted in the trial court, "the [ordinance] says one thing. [The Commonwealth is] going to prosecute something else."

Lastly, one of the officers stated that while they were issuing summonses, other Gold City dancers who were in violation of the ordinance continued to perform, but were not cited. Rather than continuing to issue summonses, the officer "just brought it to Ms. White's attention that the way they were dressed they were still in violation and that she had to bring them into compliance." Hence, we conclude there was selective enforcement of the ordinance both as to Gold City generally and with respect to particular dancers in Gold City. "A vague law

-42-

impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned, 408 U.S at 108-09.

Content-based Regulation

"To safeguard free speech, the Supreme Court requires that a regulatory measure be content neutral. The doctrine of content neutrality provides that governmental regulations may not 'restrict expression because of its message, its ideas, its subject matter, or its content.'" Adams Outdoor Adv., 236 Va. at 381, 373 S.E.2d at 922 (citing Police Dept. of City of Chicago v. Mosley, 408 U.S. 92, 95 (1972)).

The Commonwealth's Attorney conceded that the prosecutions in these cases were based "primarily" upon his opinion of the content of the performances. This focus on the content of appellants' conduct at Gold City renders the County's application of the ordinance in these cases unconstitutional.

"[N]ude [or semi-nude] dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so." Barnes v. Glen Theater, Inc., 501 U.S. 560, 566 (1991). Accordingly, "government restrictions on public nudity such as the ordinance at issue here should be evaluated under the framework set forth in [United States v.] O'Brien[, 391 U.S. 367 (1968),] for content-neutral restrictions on symbolic speech." Erie v. Pap's A. M., 529 U.S. 277, 289 (2000). That test provides that

> a government regulation is sufficiently justified if it is within the
> constitutional power of the Government; if it furthers an important
> or substantial governmental interest; if the governmental interest is
> unrelated to the suppression of free expression; and if the
> incidental restriction on alleged First Amendment freedoms is no
> greater than is essential to the furtherance of that interest.

O'Brien, 391 U.S. at 377.  Appellants conceded at trial that the County "surely" has the authority to enact the ordinance.  Thus, the first prong in O'Brien is met.  Appellants argue, however, that the ordinance does not further a substantial government interest; it is impermissibly related to the suppression of protected expressive conduct, namely erotic dancing; and that it is not sufficiently narrowly tailored to satisfy O'Brien.

The second part of the O'Brien test requires that the ordinance further a substantial government interest.

> Public indecency statutes of this sort are of ancient origin, and presently exist in at least 47 States.  Public indecency, including nudity, was a criminal offense at common law, and . . . considered an act malum en se.  Public indecency statutes such as the one before us reflect moral disapproval of people appearing in the nude among strangers in public places.

Barnes, 501 U.S. at 568 (internal citations and quotations omitted).  "This and other public indecency statutes were designed to protect morals and public order.  The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and [courts] have upheld such a basis for legislation."  Id. at 569.  We believe the Barnes analysis applies with equal force in the instant cases.  The ordinance "furthers a substantial government interest in protecting order and morality."  Id.  Therefore, the ordinance satisfies O'Brien's second requirement.

Under the third prong of O'Brien "the governmental interest must be unrelated to the suppression of free expression."  Barnes, 501 U.S. at 570.  Although the purpose for which the ordinance was adopted satisfies this requirement, the application of the ordinance in these cases is problematic.  Henrico County adopted the ordinance in 1982 to combat the problems of public

urination, exposure of the buttocks (i.e., "mooning") and skinny dipping.[29] The ordinance

provides:

> (a) As used in this section, the term "state of nudity" means a state
> of undress so as to expose the human male or female genitals,
> pubic area or buttocks or to cover any of them with less than a
> fully opaque covering, or the showing of the female breast or any
> portion thereof below the top of the nipple, or covering of the
> breast or any portion thereof below the top of the nipple with less
> than a fully opaque covering.
> (b) Every person who knowingly, voluntarily and intentionally
> appears in public or in a public place or in a place open to the
> public or open to public view in a state of nudity, or employs,
> encourages or procures another person so to appear, shall be guilty
> of a misdemeanor punishable by confinement in jail for not more
> than six months or a fine of not more than $500.00, or both.
> (c) Nothing contained in this section shall be construed to apply to
> the exhibition, presentation, showing or performance of any play,
> ballet, drama, tableau, production or motion picture in any theater,
> concert hall, museum of fine arts, school, institution of higher
> learning or other similar establishment which is primarily devoted
> to such exhibitions, presentations, shows or performances as a
> form of expression of opinion, communication, speech, ideas,
> information, art or drama.

Henrico County Code § 13-107. In contrast, the ordinances at issue in Barnes and Pap's A. M.

were flat bans on all public nudity and specifically required dancers to wear G-strings and

pasties. Barnes, 501 U.S. at 563; Pap's A. M., 529 U.S. at 284.

> The ordinance here, like the statute in Barnes, is on its face a
> general prohibition on public nudity. By its terms, the ordinance
> regulates conduct alone. It does not target nudity that contains an
> erotic message; rather, it bans all public nudity, regardless of
> whether that nudity is accompanied by expressive activity.

---

[29] Included in the record are 1982 staff memoranda from the Henrico County police discussing the need for an ordinance to prosecute "urinating or defecating in public, swimming in the nude in public, exposing one's buttocks (mooning) in public, or generally being nude in public." Inter-Office Memorandum from Lieutenant C.S. McCray, Platoon A, Henrico County Police Department, to Chief of Police (July 8, 1982). Another member of the police force noted that "we do need some type of ordinance to control urinating in public." Inter-Office Memorandum from Colonel L.T. Sheppard, Henrico County Police Department, to Commonwealth's Attorney and County Attorney (July 12, 1982). The Henrico County Board of Supervisors unanimously approved the ordinance on September 8, 1982. Minutes, Henrico County, Virginia Board of Supervisors (Sept. 8, 1982).

Pap's A. M., 529 U.S. at 290. Furthermore, the ordinance in Pap's A. M. specifically included theaters and dance halls. Thus, they satisfied the third prong of the O'Brien test, because they were directed solely at conduct without reference to expression.

In the instant cases, subsection (c) of the ordinance creates certain exemptions for nude performances, including those performed in theaters. The Commonwealth's Attorney stated that he did not believe Gold City fell within subsection (c) based on his opinion of the content of the performances at Gold City. This express reference to content brings the County's enforcement of the ordinance into the realm of First Amendment protections because those enforcing the ordinance must make content-based distinctions. See, e.g., Texas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); Iota Xi v. George Mason University, 993 F.2d 386, 390 (4th Cir. 1993) (an exception for theatrical productions cannot be limited "to protect only a narrow and limited category of professionally produced plays" rather, even "crude and amateurish and perhaps unappealing" performances "come within the First Amendment's reach"); see also Barnes, 501 U.S. at 594 ("While the entertainment afforded by a nude ballet at Lincoln Center to those who can pay the price may differ vastly in content (as viewed by judges) or in quality (as viewed by critics), it may not differ in substance from the dance viewed by the person who wants some 'entertainment' with his beer or shot of rye.") (White, J. dissenting).

As applied by the County in the instant cases, the ordinance delineates a type of expressive conduct permitted under limited circumstances and bans other types of expressive conduct that fall within the First Amendment's protection, albeit on the "outer limits" of such protection. The County argues that the exemption in subsection (c) is a "time, place and manner" regulation. Although this argument has appeal, given the express limitations on venue, the

-46-

County's enforcement in these cases does not satisfy the "alternative avenues of communication" requirement for time, place and manner regulations. City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47 (1986).[30] The County's application of the ordinance does not provide for an alternative venue within the County to convey the "erotic message," as required by the United States Supreme Court.

The fourth prong of O'Brien requires "the incidental restriction on alleged First Amendment freedoms [be] no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 377. This prong highlights another important distinction between the instant cases and Barnes and Pap's A. M. In the latter, exotic dancing in pasties and G-strings was permitted; however, the dancers sought instead to dance completely nude. In upholding the ordinances in both cases, the Court held that "any incidental impact on the expressive element of nude dancing is de minimis. The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message." Pap's A. M., 529 U.S. at 301; see also Barnes, 501 U.S. at 572 ("requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose").

In the instant cases, the legislative intent underlying the ordinance was to prevent urinating in public and similar problems. The County conceded that exotic dancing was not the activity it sought to regulate when the ordinance was adopted. Viewed in the context of its legislative history, the ordinance as applied is not narrowly drawn so that the incidental restriction on the expressive conduct at issue is no greater than is essential to prevent or deter public urination, "mooning" or skinny dipping.

---

[30] In addition, "time, place and manner" regulations must also be content-neutral and narrowly tailored. See Ward v. Rock Against Racism, 491 U.S. 781 (1989).

In summary, we agree with the U.S. District Court's reasoning that

> [T]he Supreme Court of the United States views nude dancing [as]
> expressive conduct that is entitled to some quantum of protection
> under the First Amendment. Hence, though the subject matter here
> is, as the Plaintiffs admit, mundane, it involves a well-settled right
> under the First Amendment. The exercise of that right may be
> circumscribed by local law, but the law, as applied, must allow the
> conduct permitted by the First Amendment. The law, of course,
> must clearly define the proscribed conduct and must be enforced
> equally, and not arbitrarily or capriciously, when it is applicable.
> When measured against these precepts, the Ordinance is
> troublesome. On its face, as admitted by the Commonwealth's
> Attorney, the Ordinance would make it unlawful for a mother to
> nurse her child in public, conduct that often occurs in today's
> society and that is widely accepted. It, by admission of the
> Commonwealth's Attorney, would prohibit the wearing of bathing
> suits commonly sold in the County and worn at its public pools and
> at private clubs, though the Ordinance would not necessarily be
> enforced against each technical violation. Though admitting that
> both were technically violative of the Ordinance, the
> Commonwealth's Attorney would permit Jennifer Lopez to wear
> one famously revealing dress, but prohibit her from wearing
> another as to which it is difficult to discern a difference. Some of
> these violations would be prosecuted; others would not.
> The Ordinance contains a provision, section (c), that permits the
> very conduct engaged in by and at Gold City to be performed in a
> different, but nonetheless public, venue. Mr. Kizer testified that,
> while a ballet at a dance hall, featuring completely nude dancers
> for the duration of the performance, would not be prohibited by the
> Ordinance, dancing in pasties and G-strings on the stage at Gold
> City does not fall under the exception. Section (c) has serious
> exposure to constitutional challenge as to its application, especially
> in perspective of Mr. Kizer's testimony that the content of
> constitutionally protected expressive conduct plays a role in
> assessing whether that conduct violates the Ordinance.

Colonial First Properties, 166 F. Supp. 2d at 1090.

The judgment of the trial court is reversed, and the convictions are dismissed.

Reversed and dismissed.

Kelsey, J., dissenting.

Statutes prohibiting public nudity are of "ancient origin" and "reflect moral disapproval of people appearing in the nude among strangers in public places." Barnes v. Glen Theatre, Inc., 501 U.S. 560, 568 (1991). Because the law is "constantly based on notions of morality," id. at 569 (quoting Bowers v. Hardwick, 478 U.S. 186, 196 (1986)), courts should not invalidate a law "representing essentially moral choices," id., unless it contravenes clearly defined constitutional boundaries. No such boundaries have been transgressed in this case.

It has been the traditional view that whatever natural law construct exists to support the "right to appear au naturel at home," that right is "relinquished when one sets foot outside." Richards v. Thurston, 424 F.2d 1281, 1285 (1st Cir. 1970).[31] Even so, in the "outer ambit" of constitutional theory, the erotic speech component of a particular form of public nakedness —— nude dancing at strip clubs —— receives "some measure" of First Amendment protection. Erie v. Pap's A.M., 529 U.S. 277, 285, 289 (2000); see also Barnes, 501 U.S. at 566. The right, however, is hardly a robust one. At best, it receives a "diminished form of protection under the First Amendment," Ben's Bar, Inc. v. Village of Somerset, 316 F.3d 702, 707 (7th Cir. 2003), because it involves the "barest minimum of protected expression," Barnes, 501 U.S. at 565. Put another way, the right is only "marginally" within the "outer perimeters" of the First Amendment. Barnes, 501 U.S. at 566.

---

[31] See also United States v. Biocic, 928 F.2d 112, 116 (4th Cir. 1991) (finding no right to public nudity under "the profound rights of personhood and privacy"); Chapin v. Southampton, 457 F. Supp. 1170, 1174 (E.D.N.Y. 1978) ("It is undoubted that public nudity can be banned." (citation omitted)); State v. Ciancanelli, 45 P.3d 451, 455 (Or. 2002) (surveying historical disdain toward public nudity); Lacour v. State, 21 S.W.3d 794, 796 (Tex. App. 2000) (recognizing public nudity as "merely conduct; not expressive conduct"); Tri-State Metro Naturists v. Lower, 529 A.2d 1047, 1050-53 (N.J. Super. Ct. Law Div. 1987) (recognizing that no right to appear nude in public exists under the First, Fifth, or Fourteenth Amendments); People v. Hollman, 500 N.E.2d 297, 301 (N.Y. 1986) ("prohibiting public nudity is plainly within the State's police powers").

In my opinion, none of the three constitutional attacks on Henrico's public nudity ordinance (content-based regulation of speech, vagueness, or selective prosecution) accepted by the majority can survive scrutiny under existing precedent. As <u>Erie</u> and <u>Barnes</u> confirm, the content-based challenge fails because Henrico's public nudity ordinance regulates conduct, not the content of anyone's speech. Any incidental impact on the erotic speech component falls far short of rendering the ordinance unconstitutional. The vagueness claim cannot succeed because the Virginia Supreme Court rebuffed a similar challenge to a nearly identical public nudity ban in <u>Wayside Rest., Inc. v. Virginia Beach</u>, 215 Va. 231, 236, 208 S.E.2d 51, 55 (1974), and no intervening precedent between then and now has called that judgment into question. Finally, the selective prosecution assertion does not satisfy the threshold requirements for such a claim.

That all legislative acts are "presumed to be constitutional" is more than a mere judicial aphorism. <u>Bosang v. Iron Belt Bldg. & Loan Ass'n</u>, 96 Va. 119, 123, 30 S.E. 440, 441 (1898); <u>see also</u> <u>In re Phillips</u>, 265 Va. 81, 85, 574 S.E.2d 270, 272 (2003). This presumption is "one of the strongest known to the law." <u>Black v. Commonwealth</u>, 262 Va. 764, 786, 553 S.E.2d 738, 751 (2001). Under it, courts must "resolve any reasonable doubt" regarding the constitutionality of a law in favor of its validity. <u>In re Phillips</u>, 265 Va. at 85, 574 S.E.2d at 272; <u>see also</u> <u>Wayside Rest., Inc.</u>, 215 Va. at 236, 208 S.E.2d at 55 (holding public nudity ordinance constitutional).

I will address the appellants' arguments in a different order than the majority because resolution of the first claim, which asserts the Henrico public nudity ordinance constitutes a content-based regulation of speech, directly impacts the remaining void-for-vagueness and selective prosecution claims.

I.
Content-Based Regulation

Laws that "by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." Bartnicki v. Vopper, 532 U.S. 514, 526 (2001) (quoting Turner Broad. System, Inc. v. FCC, 512 U.S. 622, 642-643 (1994)). Content-based regulations on speech can withstand a constitutional challenge only by satisfying "the most exacting scrutiny." Turner Broad. System, Inc., 512 U.S. at 641-42; see also Republican Party of Minnesota v. White, 536 U.S. 765, 774-75 (2002); Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 434 (2002) (plurality).

A law regulating expressive activity should be deemed content neutral "so long as it is 'justified without reference to the content of the regulated speech.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (emphasis in original and citation omitted). Because such regulations are "unrelated to the suppression of expression," Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 567 (2001), they are subjected to a "less-rigorous analysis," Turner Broad. Sys. v. FCC, 520 U.S. 180, 213 (1997). Sufficient government interests justifying content neutral regulations include "preventing harmful secondary effects," Erie, 529 U.S. at 293, and "protecting order and morality," Barnes, 501 U.S. at 569, both classic expressions of state police powers.

The Henrico public nudity ban regulates conduct —— not the content of anyone's speech. In this respect, the ordinance is no different from either of the two laws deemed content-neutral in Barnes and Erie. As the Supreme Court said in Erie:

> The ordinance here, like the statute in Barnes, is on its face a general prohibition on public nudity. By its terms, the ordinance regulates conduct alone. It does not target nudity that contains an

> erotic message; rather, it bans all public nudity, regardless of
> whether that nudity is accompanied by expressive activity.

Erie, 529 U.S. at 290.  The same can be said of the Henrico ordinance.

True, some may "view restricting nudity on moral grounds as necessarily related to expression."  Barnes, 501 U.S. at 570.  And, in an abstract sense, it is entirely fair to say that people "who go about in the nude in public may be expressing something about themselves by so doing."  Id.  This point, however, proves too much.  Taken to its logical limits, it obliterates any First Amendment distinctions between speech and conduct.  A flasher in a public mall may genuinely intend to communicate a message —— whether erotic, neurotic, or both.  But the communicative element in his conduct should receive no constitutional protection.  Despite the libertarian traditions animating the First Amendment, we are not dealing here with protecting the societal value of "untrammeled political debate" and "few of us would march our sons and daughters off to war to preserve a citizen's right" to unlimited expression of public sexuality.  Erie, 529 U.S. at 294 (quoting Young v. American Mini Theatres, Inc., 427 U.S. 50, 70 (1976)).

The majority takes no issue with Erie or Barnes, but instead seeks to distinguish them on the ground that the Henrico ordinance contains an exemption for artistic and theatric performances.  The public nudity ban in Erie, the majority states, "specifically included theaters and dance halls."  Ante, at 14.  From there, the majority reasons that the artistic and theatrical nudity exemption in the Henrico ordinance transforms an otherwise permissible, content-neutral public nudity ban into a thinly disguised content-based restriction.  I disagree.

Despite the fact that the public nudity ban in Erie did not include an express exemption, the prosecutor in Erie stipulated that the ban did not apply to theatrical and artistic nudity.  Making the same argument as the majority here, the dissent in Erie seized upon this stipulation:

> In an earlier proceeding in this case, the Court of Common Pleas
> asked Erie's counsel "what effect would this ordinance have on
> theater . . . productions such as Equus, Hair, O[h!] Calcutta[!]?

-52-

> Under your ordinance would these things be prevented  . . . ?"
> Counsel responded: "No, they wouldn't, Your Honor."  App. 53.
> Indeed, as stipulated in the record, the city permitted a production
> of Equus to proceed without prosecution, even after the ordinance
> was in effect, and despite its awareness of the nudity involved in
> the production. . . .  As presented to us, the ordinance is
> deliberately targeted at Kandyland's type of nude dancing (to the
> exclusion of plays like Equus), in terms of both its applicable
> scope and the city's enforcement.
>
>         \*       \*       \*       \*       \*       \*       \*
>
> Nor could it be contended that selective applicability by stipulated
> enforcement should be treated differently from selective
> applicability by statutory text.  See Barnes, 501 U.S. at 574 (Scalia,
> J., concurring in judgment) (selective enforcement may affect a
> law's generality).  Were it otherwise, constitutional prohibitions
> could be circumvented with impunity.

Id. at 328 n.12 (Stevens, J., dissenting).  The plurality in Erie rejected this argument and

acknowledged that its own analysis presupposed that the public nudity ban had "the effect of

limiting one particular means of expressing the kind of erotic message being disseminated at

Kandyland."  Id. at 293.

The same is true of the public nudity ban in Barnes.  Notwithstanding the absence of any

express exemption, the public nudity ban there had been construed by the state courts to exclude

theatrical and artistic nudity.[32]  The Supreme Court acknowledged this limiting construction on

the ordinance as a legitimate effort by the state courts to "save it from a facial overbreadth

attack."  Barnes, 501 U.S. at 564 n.1.  In his concurring opinion, Justice Scalia agreed:

> Respondents also contend that the statute, as interpreted, is not
> content-neutral in the expressive conduct to which it applies, since
> it allegedly does not apply to nudity in theatrical productions.  See
> State v. Baysinger, 272 Ind. 236, 247, 397 N.E.2d 580, 587 (1979).

---

[32] See Indiana v. Baysinger, 397 N.E.2d 580, 587 (Ind. 1979) (noting that it is
"constitutionally required to tolerate or to allow some nudity as a part of some larger form of
expression meriting protection" and, therefore, limiting the reach of the Indiana Public Indecency
statute only to activities involving pure conduct containing no constitutionally protected
expressive element); Glen Theatre, Inc. v. Pearson, 802 F.2d 287, 289 (7th Cir. 1986) (basing its
rejection of the plaintiff's overbreadth claim on the limiting construction provided by Baysinger).

> I am not sure that theater versus non-theater represents a
> distinction based on content, rather than format, but assuming that
> it does, the argument nonetheless fails for the reason the plurality
> describes, <u>ante</u>, at 564, n.1.

<u>Id.</u> at 574 n.2.

By including an express exemption for theatrical and artistic nudity, Henrico merely put in writing what was implicit in both the <u>Erie</u> and <u>Barnes</u> public nudity bans. The exemption in the Henrico ordinance does nothing more than ensure that the ordinance incidentally restricts the least amount of expressive conduct, and thus, protects the ordinance against an overbreadth challenge. <u>See</u>, <u>e.g.</u>, <u>Giovani Carandola, Ltd. v. Bason</u>, 303 F.3d 507, 517-19 (4th Cir. 2002) (holding lack of any artistic and theater exemption raised overbreadth problems sufficient to warrant a preliminary injunction).

In addition, the artistic and theatrical exemption reflects a legitimate recognition of the unique secondary effects associated with erotic clubs. "Establishments that purvey erotica, live or pictorial, tend to be tawdry, to be offensive to many people, and to attract a dubious, sometimes a disorderly, clientele." <u>Blue Canary Corp. v. City of Milwaukee</u>, 251 F.3d 1121, 1124 (7th Cir. 2001). The impact of erotic dancing and other sexually oriented businesses on the surrounding community is "all too real." <u>Alameda Books, Inc.</u>, 535 U.S. at 444 (Kennedy, J., concurring).[33]

A public nudity ban should be "properly evaluated as a content-neutral restriction because the interest in combating the secondary effects associated with those clubs is unrelated to the suppression of the erotic message conveyed by nude dancing." <u>Erie</u>, 529 U.S. at 296; <u>see</u>

---

[33] <u>See</u> <u>Erie</u>, 529 U.S. at 299 (rejecting suggestion in dissenting opinion that municipality must develop "specific evidentiary record" on secondary effects); <u>Giovani Carandola, Ltd.</u>, 303 F.3d at 514 ("No record evidence supports this [secondary effects] claim. . . . Even though the Commission has submitted no direct evidence of legislative motive, we believe that precedent requires us to evaluate the challenged restrictions as content-neutral provisions aimed at secondary effects.").

also Clark v. City of Lakewood, 259 F.3d 996, 1004 (9th Cir. 2001). So, while the messages conveyed by erotic dancing and theatrical nudity may be similar, the social by-products of each medium may be considerably different. See DLS, Inc. v. Chattanooga, 107 F.3d 403, 412 n.9 (6th Cir. 1997).[34] Within the "limited field of regulations on public exhibitions of adult entertainment," therefore, the presence of negative secondary effects permits public nudity regulations to be treated "as content-neutral and so subject only to intermediate scrutiny." Giovani Carandola, Ltd., 303 F.3d at 515.

All of this leads us to the application of the four-part test governing content-neutral restrictions on speech. Under that test, the Henrico ordinance survives scrutiny if it (i) falls within "the constitutional power" of the county, (ii) furthers an "important or substantial government interest," (iii) furthers that interest in a manner "unrelated to the suppression of free expression," and (iv) imposes no greater incidental restriction on protected speech "than is essential to the furtherance of that interest." Erie, 529 U.S. at 296-301; see also Barnes, 501 U.S. at 567; United States v. O'Brien, 391 U.S. 367, 376-77 (1968). I agree with the majority's conclusion that the Henrico public nudity ban satisfies prongs one and two, but disagree with its finding that it violates prongs three and four.

On the third prong, the majority finds that the "purpose" of the ordinance is unrelated to the suppression of free expression, ante, at 13, but its "application" is not. In support, the majority again asserts that the artistic and theatrical exemption (written into the text of the ordinance) requires law enforcement officials to "make content-based distinctions." Ante, at 15. As noted earlier, however, the same exemption was present in Barnes and Erie. It serves an

---

[34] A municipality's means for attacking secondary effects need not "greatly reduce these secondary effects." SOB, Inc. v. County of Benton, 317 F.3d 856, 863 (8th Cir. 2003) (citing Erie, 529 U.S. at 301). Instead, the means must merely "further the interest in combating such effects." Id. (citing Erie, 529 U.S. at 301). Municipalities enjoy this leeway to have "a

-55-

important limiting function by avoiding potential overbreadth problems.  See Barnes, 501 U.S. at 564 n.1.  The exemption also rests on a valid assessment of the differing secondary effects between the two venues.  The focus on secondary effects was at the heart of the Erie holding:

> Even if we had not already rejected the view that a ban on public nudity is necessarily related to the suppression of the erotic message of nude dancing, we would do so now because the premise of such a view is flawed.  The State's interest in preventing harmful secondary effects is not related to the suppression of expression.

Erie, 529 U.S. at 292.  The artistic and theatrical exemption, therefore, does not violate the third prong of the content-neutral test any more than it did in Barnes or Erie.

The majority also holds that the Henrico ordinance violates the fourth prong.  On this issue, the majority states that the "legislative intent" of the ordinance was "to prevent urinating in public and similar problems."  Ante, at 17.  But, because the literal text of the ordinance also applies to erotic dancing, the majority reasons, the ordinance goes further than necessary "to prevent or deter public urination, 'mooning' or skinny dipping."  Ante, at 17.

I cannot accept this analysis for several reasons.  To begin with, the trial court made no factual finding that the purpose of the ordinance was limited to public urination, mooning, and skinny dipping.  The majority's assertion appears to be taken from a memo from a lieutenant in the county police department to the police chief.  The memo mentions the need of an ordinance to outlaw public urination, mooning, and skinny dipping.  The same memo, however, also adds that the ordinance should prohibit "generally being nude in public."  The majority's assertion, therefore, relies on a non-legislative source that, in any event, contemplates a greater scope than merely proscribing mooning, public urination, and skinny dipping.

---

reasonable opportunity to experiment with solutions to admittedly serious problems."  SOB, Inc., 317 F.3d at 863 (citation omitted).

The only reliable source for legislative intent can be found in a memo of the Henrico

County Board of Supervisors accompanying the proposed ordinance at the time of its enactment.

It reads:

> The purpose of this ordinance is to make unlawful <u>displays of public nudity in the County, which are deemed offensive to public morality and injurious to the health, safety and general welfare of County citizens</u>, regardless of whether such nudity would or would not in any specific instance be deemed obscene. The ordinance contains exception for exhibitions and other performances in institutions or establishments, such as theaters and concert halls, primarily devoted to expressions of opinion, communication, speech, ideas, information, art or drama.

(Emphasis added.)

The stated purpose of the public nudity ban, therefore, involves broad concerns over

"public morality" and the need to regulate conduct that the legislative body deemed "injurious to

the health, safety and general welfare" of the community. <u>Id.</u> It was exactly these concerns over

"secondary effects, such as the impacts on public health, safety, and welfare," <u>Erie</u> explained,

"which we have previously recognized are 'caused by the presence of even one such'

establishment." <u>Erie</u>, 529 U.S. at 291 (citation omitted). <u>Barnes</u> likewise found that an identical

expression of the "traditional police power" of a state to "provide for the public health, safety,

and morals" may serve as a permissible legislative goal for the enactment of a public nudity

ordinance applicable to erotic dancing. <u>Barnes</u>, 501 U.S. at 569.[35]

---

[35] Even if we did not have this legislative history, the legislative intent underlying public nudity bans can be inferred as a matter of law. <u>See</u> <u>Barnes</u>, 501 U.S. at 567-68 ("It is impossible to discern, other than from the text of the statute, exactly what governmental interest the Indiana legislators had in mind when they enacted this statute . . . . Nonetheless, the statute's purpose of protecting societal order and morality is clear from its text and history. Public indecency statutes of this sort are of ancient origin, and presently exist in at least 47 States. Public indecency, including nudity, was a criminal offense at common law, and this Court recognized the common law roots of the offense of 'gross and open indecency' in <u>Winters v. New York</u>, 333 U.S. 507, 515 (1948). Public nudity was considered an act <u>malum</u> <u>en</u> <u>se</u>. <u>Le Roy v. Sidley</u>, 1 Sid. 168, 82 Eng. Rep. 1036 (K.B. 1664). Public indecency statutes such as the one before us reflect moral disapproval of people appearing in the nude among strangers in public places.")

Properly applied, the fourth prong of the Erie content-neutral test requires us to consider whether the ordinance imposes too great an incidental burden on speech. Before engaging in this analysis, we must first frame the issue precisely. The only constitutional right here (albeit one "marginally" within the "outer perimeters" of the First Amendment, Barnes, 501 U.S. at 566) is the erotic message implicit in nude or semi-nude dancing. There is no general right to take one's clothes off in public. Nor is there a constitutional right to wear pasties and G-strings rather than the lingerie-like tops and bottoms required by the Henrico ordinance. Thus, we cannot ask whether requiring slightly more clothes restricts the erotic dancer's right to be less clothed. "Being 'in a state of nudity,'" after all, "is not an inherently expressive condition." Erie, 529 U.S. at 289. Instead, we must ask whether the ordinance unduly burdens the dancer's ability to express her erotic message by requiring her to cover up slightly more of her body with slightly more fabric.

Erie held that going from complete nudity to being partly clothed (with pasties and a G-string) involved a de minimis impact on the ability of a dancer to express eroticism. Erie, 529 U.S. at 294. The Henrico ordinance, in contrast, does not involve a transition from totally nude to partly clothed, but rather one from partly clothed to slightly more partly clothed. If going from naked to non-naked involves a constitutionally insignificant difference in degree, then the incrementally more fabric required by the Henrico ordinance can hardly constitute a constitutionally fatal difference. In this respect, the Henrico ordinance involves no more of a burden on the dancer's free speech than the Erie requirement to wear some form of clothing in the first place. The dancer's erotic message still reaches its intended audience. The additional clothing just "makes the message slightly less graphic." Barnes, 501 U.S. at 571.

In determining whether "particular conduct possesses sufficient communicative elements to bring the First Amendment into play," we should consider not only the messenger's intent but

also whether "the likelihood was great that the message would be understood by those who viewed it." Texas v. Johnson, 491 U.S. 397, 404 (1989) (quoting Spence v. Washington, 418 U.S. 405, 410-11 (1974)). Along these same lines, I do not accept the majority's unstated assumption that the more graphic the dancer's display of nudity the more erotic her message becomes. While that may be true at the extremes (like the contrast between a dancer in a snow skiing suit and one completely naked), it is not true at the margins (like the contrast between a dancer wearing almost nothing and one wearing slightly more than almost nothing). Sharon Boyd, the erotic dancer in this case, made this point as well as anyone could:

> Q: Is it, you get, you work by way of tips only at Gold City, is that correct?
>
> A: Correct.
>
> Q: And that the more, is it fair to say in your experience, the more skin you show, the more tips you get?
>
> A: Not, not at all. Not at all. I'm –
>
> Q: -- So you're –
>
> A: -- covered up. I work there, to this day, I work covered up every day and I make probably more money than I did before.

If we gauge the effectiveness of Boyd's erotic message by the measurable reaction of the recipients of that message —— a task the First Amendment requires, Texas, 491 U.S. at 404 —— we must conclude that the Henrico ordinance has had little, if any, negative impact on the erotic speech component of her dancing.

For these reasons, I agree with the conclusion reached by the federal courts that have held that pasties and G-strings do not represent "the maximum requirements of dress that an anti-nudity ordinance may impose." Café 207 v. St. Johns County, 856 F. Supp. 641, 645-46 (M.D. Fla. 1994), aff'd, 66 F.3d 272 (11th Cir. 1995); see also Bright Lights v. City of Newport,

830 F. Supp. 378, 383-84 (E.D. Ky. 1993).  I also agree with the trial court in our case that the Henrico ordinance satisfies all four prongs of the Erie content-neutral test.

## II.
## Void For Vagueness

An enactment may be found void for vagueness under either of two related theories.  See Hill v. Colorado, 530 U.S. 703, 733 (2000).  First, if a statute "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" it may be found vague.  Id.  Second, an enactment may be found vague if "it authorizes or even encourages arbitrary and discriminatory enforcement."  Hill, 530 U.S. at 733.

The majority finds both vagueness infirmities with Henrico's public nudity ordinance.  On the first point, the majority says that Henrico officials "never gave appellants any advance warning" that their conduct violated the public nudity ordinance.  Ante, at 7-8.  County officials, however, did not have to give the erotic club or any of its dancers specific notice of the ordinance.  The mere promulgation of the ordinance was notice to all.  See generally Bryan v. United States, 524 U.S. 184, 196 (1998) (recognizing the "traditional rule that ignorance of the law is no excuse").  "The determination whether a criminal statute provides fair warning of its prohibitions must be made on the basis of the statute itself and the other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants."  Bouie v. Columbia, 378 U.S. 347, 355 n.5 (1964).  Under settled law, therefore, we must apply "an objective test for determining whether a statute is vague."  Laurence H. Tribe, Constitutional Law § 12-31, at 1033 n.3 (2d ed. 1988).

The proper test requires focus on whether a reasonable person could have understood what the Henrico public nudity ordinance literally proscribed.  See Hill, 530 U.S. at 733.  The Virginia Supreme Court resolved that issue in Wayside Rest., Inc., 215 Va. at 236, 208 S.E.2d at 55.  There, an erotic club challenged a similar public nudity ordinance on vagueness grounds.

The Virginia Supreme Court held that the challenged terms in the ordinance were "in common use" and "readily understood by the average person." Id. The wording of the Henrico ordinance uses nearly identical language, having been patterned (the evidence at trial proved) expressly after the Virginia Beach ordinance approved by Wayside Rest., Inc.

For example, the Henrico ordinance defines a "state of nudity" in a manner similar to the public nudity ordinance in Wayside Rest., Inc., 215 Va. at 232 n.1, 208 S.E.2d at 52 n.1. The words used in the definition section of the public nudity ordinance —— "buttocks," "female breast," "top of the nipple" and the like —— are commonly understood terms. Cf. Code § 18.2-390(2) (using identical language to define nudity). Similarly, the artistic and theater exemption in the Henrico ordinance tracks verbatim the exemption in Wayside Rest., Inc., 215 Va. at 232 n.1, 208 S.E.2d at 52 n.1. Indeed, the Virginia Supreme Court found that the most arguably ambiguous language in the exemption —— the catch-all phrase "other similar establishment" following the list of artistic venues like plays, dramas, and theaters —— was not unconstitutionally vague. Id. at 236, 208 S.E.2d at 55; see also Bomhower v. Virginia Beach, 76 F. Supp. 2d 681, 686 (E.D. Va. 1999) (rejecting similar vagueness challenge to a public nudity ordinance).

In addition, a specific "scienter requirement" in an ordinance (requiring that criminal culpability be grounded on knowing violations of law) further protects a law from a vagueness challenge. Hill, 530 U.S. at 732. A scienter requirement "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982). The Henrico ordinance contains a specific scienter requirement that the accused must "knowingly, voluntarily and intentionally" be in public in a "state of nudity." Henrico County Code

-61-

§ 13-107(b). This scienter requirement, built into the text of the ordinance, undermines the appellants' claim of inadequate notice.

I also disagree with the majority's assertion that the vagueness test should turn on whether the Henrico ordinance applies to "technical" violators like women wearing "contemporary swimwear," "short-shorts," or mothers engaged in breast feeding. Ante, at 7. As the United States Supreme Court recently emphasized, "speculation about possible vagueness in hypothetical situations not before the Court" should be given no weight in the analysis. Hill, 530 U.S. at 733 (quoting United States v. Raines, 362 U.S. 17, 23 (1960)). "There is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question," id. (quoting American Communications Assn. v. Douds, 339 U.S. 382, 412 (1950)), but the focus must remain on the facts before the court.

As a result, one "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Hoffman Estates, 455 U.S. at 495; see also Parker v. Levy, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); Bomhower, 76 F. Supp. 2d at 686 (holding that an erotic club, against which the public nudity ordinance clearly applied, could not assert vagueness claim on behalf of others). The erotic dancers in this case stripped down to pasties and G-strings. They were not wearing "contemporary swimwear" or "short-shorts." Ante, at 7. Nor were they breast-feeding on stage. The majority's reliance on such "hypothetical situations not before the Court," Hill, 530 U.S. at 733 (citation omitted), pushes vagueness law considerably beyond existing precedent.

Finally, I disagree that the ordinance violated the vagueness test on the ground that "it authorizes or even encourages arbitrary and discriminatory enforcement." Hill, 530 U.S. at 733. Because law enforcement always "requires the exercise of some decree of police judgment,"

Grayned v. City of Rockford, 408 U.S. 104, 114 (1972), a law should not be invalidated unless its clarity has been "designedly avoided so as to allow the net to be cast at large," Papachristou v. City of Jacksonville, 405 U.S. 156, 166 (1972) (citation omitted).

On this issue, I see no persuasive point to be made over the police officer's comment that he would have to "see a particular item of clothing" before determining whether to issue a summons. Ante, at 9. It is entirely appropriate for a police officer to examine the conduct in question and make a judgment as to whether, under the probable cause standard, the conduct is illegal. The vagueness test does not forbid individualized assessments by law enforcement officers. What it forbids is a law that, by its expansive sweep of language, enacts an elastic definition of illegality —— one that authorizes an officer to define for himself what is and is not legal. Nothing in the Henrico ordinance goes that far.

III.
Selective Prosecution

The structure of tripartite government creates a judicial presumption in favor of "broad" prosecutorial discretion. See United States v. Armstrong, 517 U.S. 456, 464-65 (1996). "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." Wayte v. United States, 470 U.S. 598, 607 (1985). "Even in the criminal-law field, a selective prosecution claim is a rara avis." Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 489 (1999). Thus, "in the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion.'" Armstrong, 517 U.S. at 464 (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)). "To succeed on a selective-prosecution claim, a defendant must demonstrate that the prosecutor's decision 'was based on an unconstitutional motive.'" Rowsey v. Lee, 327 F.3d ___, ___, 2003 U.S. App. LEXIS 7735, at *16 (4th Cir. April 24, 2003) (Wilkinson, J.) (citation omitted).

In this case, the majority holds the Henrico ordinance unconstitutional as applied to these appellants on "selective enforcement" grounds. Ante, at 10. This holding rests primarily on the prosecutor's concession that he would not prosecute "technical" violations of the ordinance, ante, at 9, which would include some forms of skimpy swimwear at public pools, nursing mothers in public, and the like. For several reasons, I believe this holding fails to satisfy the "demanding" standard, Armstrong, 517 U.S. at 463, required of selective prosecution claims.

First, a selective prosecution claim requires a showing that "the prosecutor has brought the charge for reasons forbidden by the Constitution." Armstrong, 517 U.S. at 463. The claim cannot succeed without proof that the prosecution was "'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,' including the exercise of protected statutory and constitutional rights." Wayte, 470 U.S. at 608 (quoting Bordenkircher, 434 U.S. at 364, Oyler v. Boles, 368 U.S. 448, 456 (1962), and citing United States v. Goodwin, 457 U.S. 368, 372 (1982)).

The appellants' as-applied selective enforcement claim fails for the same reason their content-based attack fails: The dancers have no First Amendment right to wear pasties and G-strings rather than the lingerie-like tops and bottoms required by the Henrico ordinance. Because the ordinance involves a content-neutral regulation of conduct that does not unduly burden any protected erotic speech, the appellants cannot claim they were being targeted for constitutionally suspect reasons. In other words, the appellants cannot show that Henrico prosecuted them "because of" their expression of constitutionally protected speech. Wayte, 470 U.S. at 610 (emphasis in original).

Second, the selective prosecution claim, having been rejected by the fact finder at trial, can only succeed on appeal if the facts demonstrate it as a matter of law. The factual record cannot support this showing. No evidence proved any "technical violations" had in fact occurred

-64-

in Henrico County.  The majority's holding on this point, as well as the prosecutor's remarks about it, involve purely hypothetical situations —— the most fanciful of which being the observation that the enforcement of the public nudity ban would "permit Jennifer Lopez to wear one famously revealing dress," but might prohibit her from wearing others.  See ante, at 18 (adopting for its holding the federal court's order which abstained from deciding the issue).  Once one gets beyond the hypotheticals, no evidence in this case demonstrated that the prosecutors had used the ordinance to target erotic dancing.  Just the opposite was shown: Thirty-eight individuals had been prosecuted under the public nudity ban, and this one case involves the only application of the ordinance against erotic dancers.

Finally, even if the hypothetical "technical cases" were real, the secondary effects doctrine provides a constitutionally adequate basis for judicial deference to prosecutorial discretion.  See generally Erie, 529 U.S. at 295 (recognizing "that one specific occurrence of public nudity —— nude erotic dancing —— is particularly problematic because it produces harmful secondary effects").  The impact on the local community of a strip club featuring erotic dancers can hardly be equated with nursing mothers in public restaurants, swimmers at a neighborhood pool, or, for that matter, a surprise visit from a scantily-clad Jennifer Lopez.  For the same reason the secondary effects principle provides legitimacy to the governmental interest in regulating the business of erotica, it also explains why prosecutors may make commonsense distinctions between nursing mothers and swimmers, on the one hand, and erotic dancers, flashers, and public urinators, on the other.

## IV.

In sum, I disagree with the majority's reasoning as well as its result.  Both take the marginal speech right implicit in erotic dancing well beyond any existing precedent.  I would affirm the trial court's finding that the Henrico ordinance neither operates as a content-based

-65-

regulation of free speech nor offends void-for-vagueness principles. I also agree with the trial

court that the appellants did not make out a legally viable claim of selective prosecution.

For these reasons, I respectfully dissent.